1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 14-13254-scc

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  199 EAST 7TH STREET, LLC,

9          Debtor.

10

11  - - - - - - - - - - - - - - - - - - - -x

12

13              United States Bankruptcy Court

14              One Bowling Green

15              New York, New York

16

17              September 29, 2016

18              10:09 AM

19

20

21

22  B E F O R E:

23  HON. SHELLEY C. CHAPMAN

24  U.S. BANKRUPTCY JUDGE

25

1

2   Doc #75 Ex Parte Application of the Chapter 7 Interim Trustee

3   for an Order (I) Directing the Preservation of Documents and

4   Recorded Information and (II) Authorizing the Issuance of

5   Subpoenas for the Production of Documents and Deposition

6   Testimony Pursuant to Rule 2004 of the Federal Rules of

7   Bankruptcy Procedure (Attachments: Exhibits 1-4) filed by Neil

8   Matthew Berger on behalf of Albert Togut

9

10  Doc #74 Motion for Stay Pending Appeal filed by David Carlebach

11  on behalf of 199 East 7th Street LLC

12

13

14

15

16

17

18

19

20  Transcribed by:  Dena Page

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

```
 1
 2   A P P E A R A N C E S:
 3   CARLEBACH LAW GROUP
 4         Attorneys for Debtor
 5         55 Broadway
 6         Suite 1902
 7         New York, NY 10006
 8
 9   BY:   DAVID CARLEBACH, ESQ.
10
11
12   TOGUT, SEGAL & SEGAL LLP
13         Attorneys for Chapter 7 Interim Trustee
14         One Penn Plaza
15         New York, NY 10119
16
17   BY:   NEIL BERGER, ESQ.
18
19
20
21
22
23
24
25
```

1

2  UNITED STATES DEPARTMENT OF JUSTICE

3          Office of the United States Trustee

4          201 Varick Street

5          Suite 1006

6          New York, NY 10014

7

8  BY:   ANDREW VELEZ-RIVERA, ESQ.

9          BRIAN MASUMOTO, ESQ.

10

11

12  NEW YORK CITY LAW DEPARTMENT

13          Attorneys for City of New York

14          Office of the Corporation Counsel

15          100 Church Street

16          New York, NY 10007

17

18  BY:   GABRIELA P. CACUCI, ESQ.

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           THE COURT:  Good morning.

3           MR. BERGER:  Good morning, Judge.

4           THE COURT:  Good morning, Mr. Berger.

5           MR. BERGER:  Neil Berger of Togut, Segal & Segal.  We

6    represent Albert Togut, the Chapter 7 interim trustee; Mr.

7    Togut is with me today.

8           THE COURT:  Okay.

9           MR. TOGUT:  And I am not billing as a lawyer.

10          THE COURT:  Okay.

11          MR. TOGUT:   Al Togut, trustee.

12          THE COURT:  All right, thank you, Mr. Togut.

13          MR. VELEZ-RIVERA:  Good morning, Judge; Andy Velez-

14   Rivera for the U.S. Trustee.

15          THE COURT:  Hello, Mr. Velez-Rivera.

16          MR. MASUMOTO:  Good morning, Your Honor; Brian

17   Masumoto for the Office of the United States Trustee.

18          THE COURT:  Good morning, Mr. Masumoto.

19          MS. CACUCI:  Gabriela Cacuci for the City of New York.

20          THE COURT:  Good morning, Ms. Cacuci.

21          MR. CARLEBACH:  David Carlebach representing the

22   debtor.

23          THE COURT:  Good morning, Mr. Carlebach.

24          All right, so we have a few things that are on for

25   hearing today.  First and foremost is the motion for a stay

1   pending appeal of the September 8th order appointing the

2   Chapter 7 trustee, and ordering the return of funds to the

3   estate.  Just for the purposes of the record, there is the

4   motion that was filed by Mr. Carlebach's office.  The U.S.

5   Trustee filed an objection to the debtor's motion.  The Chapter

6   7 interim trustee filed a joinder in opposition to the stay

7   pending appeal.  There was a letter filed by Ms. Cacuci on

8   behalf of the City of New York Law Department.  There was a

9   declaration, I think, filed in the middle of the night last

10  night by Mr. Carlebach in opposition to the letter objection of

11  the City of New York.  I don't know if everyone saw that, Ms.

12  Cacuci, I don't know if you're aware of that.

13          MS. CACUCI:  I was just given a copy of it.

14          THE COURT:  Okay.

15          MS. CACUCI:  And I've briefly --

16          THE COURT:  Okay.  And then in addition, on the other

17  matter, the trustee had sought and obtained an ex parte order

18  directing the preservation documents, which the Court approved,

19  and subsequent to that, Mr. Carlebach's office filed an

20  objection of the debtor to the ex parte motion of the trustee

21  for injunctive relief and the retention of counsel.  I think

22  that's about it; hopefully, I didn't miss anything.

23          So Mr. Carlebach, it's your motion; would you like to

24  proceed first?

25          MR. CARLEBACH:  Yes.  Firstly, just procedurally, I

199 EAST 7TH STREET, LLC.                                          7

1  did get a call from your chambers that the motion would be on

2  for today, but there was not -- I had submitted a scheduling

3  order; it was not signed.  And I had received responses

4  intermittently, first from the UST, then from the trustee.

5  Later, at 6 o'clock last night, I received something from the

6  City, and that's why the -- it sort of just was a little

7  haphazard, but --

8          THE COURT:  Well, it started out in a haphazard

9  fashion because, generally speaking, a couple of things:  one,

10 there is no entitlement to a hearing on a motion for a stay

11 pending appeal, but I thought it would be important to afford

12 you that opportunity.  Secondly, what generally happens when a

13 party seeks a scheduling order is they contact chambers and

14 work through the dates.  What was done here was to give you the

15 first available hearing date, and --

16         MR. CARLEBACH:  No, I'm not --

17         THE COURT:  -- and here we are, so --

18         MR. CARLEBACH:  I'm not criticizing --

19         THE COURT:  -- if you --

20         MR. CARLEBACH:  -- anything.  I'm simply saying that,

21 unlike, for example, the trustee's motion that had very fixed

22 objection times, it was not a fixed objection time, so

23 that's -- I'm just explaining why my reply came in -- or it was

24 about 12:30 last night because --

25         THE COURT:  Okay.

1          MR. CARLEBACH:  I was just absorbing a lot that had

2     come in that day in terms of the motion.

3          THE COURT:  All right, well, unless you would like to

4     have -- unless there is some sense that you need additional

5     time, it seems that everybody kind of stepped up and promptly

6     replied to what you had filed, and we'll move on.  There was

7     nothing sinister about the failure to enter the scheduling

8     order; there was simply no follow-up with respect to the

9     scheduling order, and we just proceeded to put it on the

10    calendar on the first available date.

11         MR. CARLEBACH:  Understood.  I simply wanted to -- I

12    mean, I agree there is no need to put anything over.  I would

13    have preferred to have a little more time to respond to some of

14    the -- I did respond to the City's objection, and I would just

15    respond on the record to the --

16         THE COURT:  Sure.

17         MR. CARLEBACH:  -- standing issue that the Chapter 7

18    trustee raised.  And they relied primarily, on the line of

19    cases; I believe it's known as South Edge and C.W. Mining.  And

20    I just wanted to point out a few factors which distinguish

21    those cases from -- for this case from those cases.  Firstly,

22    there was a failure to interpose opposition by the parties

23    there -- we opposed the appointment of a trustee; there was an

24    objection filed -- and failure to interpose opposition,

25    obviously, prejudiced their ability to file an appeal.  If you

1  don't file an objection, your ability to file an appeal is

2  severely hampered.

3          Secondly, they didn't seek a stay.  Seeking a stay, in

4  conjunction with appealing an order appointing a trustee,

5  automatically confers standing.  So we moved for a stay, and

6  the fact that we moved for a stay, once again, distinguishes

7  the facts from that case.

8          Finally, and perhaps most importantly, in that case,

9  there was no equity; it was an insolvent estate.  There was

10  nothing coming back to equity or to the debtor, per se, and

11  therefore, the debtor, per se, was not an aggrieved party.

12  Here, under 726, I believe it is, this is all about equity.  I

13  mean, that's part of our general opposition here is the fact

14  that we believe there are no real creditors in this case,

15  and --

16          THE COURT:  Well, it's -- first of all, I'm perfectly

17  happy to hear you on the merits on an alternative basis to the

18  standing issue, and I hear the arguments that you're making,

19  but it's a curious statement to say there are no real creditors

20  because then that raises the question of why this case was

21  filed in the first place, since Chapter 11 is for the purpose

22  of reorganizing and paying creditors.  So I don't think we

23  really want to go down that particular line of argument, but in

24  any event, if you want to move --

25          MR. CARLEBACH:  Well, I mean, there --

1          THE COURT:  -- move to your other --

2          MR. CARLEBACH:  There was one -- we made -- we had

3    numerous hearings here with Mr. Markowitz (ph.) in the

4    courtroom who made no bones about the fact that the primary

5    purpose of the filing was because there was this litigation

6    with the co-op board; they were about to enter judgment against

7    us, and that litigation was successfully resolved.  Mr.

8    Markowitz insisted that he be paid at closing; he was paid at

9    closing.  So the primary creditor in the case was paid.

10          The only other creditor who was scheduled was a small

11   de minimis amount for -- I don't really need to go into it.

12   I'm just saying that I don't have a problem with the purpose of

13   the filing.  The most important creditor -- and there was

14   litigation before this Court on that issue, we filed an

15   objection -- was paid.  So that's why when we filed, there was

16   a legitimate bankruptcy purpose, but today, there is not, like

17   I say, a real creditor, and I can go into the City's issue.

18          So point being that there is substantial equity in

19   this case, and therefore, the debtor is what's called an

20   aggrieved person and has standing to appeal because under the

21   priority distribution code -- I believe it's 721 or 726 of the

22   Code, the debtor, if there is equity left or equity has to be

23   paid over to the debtor.  As we sit here today, the equity is

24   substantial, and our concern, of course, is that's going to

25   drop dramatically if this trustee goes forward.  But --

1              THE COURT:  I'm sorry, what was that last statement; I

2    couldn't hear you?

3              MR. CARLEBACH:  Our concern here, I'm saying in the

4    very general sense, is that the equity that we've created in

5    this case is going to disappear by the plethora of litigation

6    that has already been started by the trustee over a --

7              THE COURT:  Well, but that --

8              MR. CARLEBACH:  Well --

9              THE COURT:  -- we're already far afield from having a

10   discussion --

11             MR. CARLEBACH:  Yeah, I was just --

12             THE COURT:  -- about the --

13             MR. CARLEBACH:  Yeah, I'm simply saying that the --

14             THE COURT:  Mr. Carlebach, I would like to be able to

15   finish my sentences, if you don't mind.

16             MR. CARLEBACH:  Okay, I'm sorry.

17             THE COURT:  The case was converted, and an order was

18   entered reflecting the conversion and directing that the funds

19   that were distributed without Court authority be returned.

20   This case can be over in forty-eight hours with a couple of

21   phone calls, and perhaps a meeting, once things are put right

22   and the house is in order.  There is no basis for the

23   observation or the surmise that the equity, which was taken

24   without authority by the principal of the debtor, an undisputed

25   fact, is going to be transferred to the trustee.

1           First of all, the trustee cannot be paid without an

2    order of this Court.  Second of all, this wouldn't be the first

3    time nor the last time that a Chapter 7 trustee works without

4    being paid.  This is all about the fact that there were serious

5    breaches of compliance with what's required in a Chapter 11

6    case.

7           The primary argument that you've made is no harm, no

8    foul, and I'm not going to go into all of the other -- I would

9    say quote/unquote "arguments" that have been made.  We're here

10   today to discuss whether or not you should be given a stay

11   pending appeal, and that's what I'm prepared to talk about

12   today.

13           MR. CARLEBACH:  So I'd like to go into the four-prong

14   test.  And again, the irreparable harm we have alleged the

15   debtor will suffer is -- again, is primarily the costs that

16   the -- the costs of the trustee.  And I appreciate what Your

17   Honor said about a meeting, and I actually tried to reach out

18   to Mr. Goldberg (sic) to see if we could work something out.

19           THE COURT:  To whom?

20           MR. CARLEBACH:  Mr. Goldberg sitting next to me.

21           THE COURT:  No, that would be Mr. Berger.

22           MR. CARLEBACH:  Mr. Berger, I always make that -- I've

23   made that mistake for twenty years --

24           THE COURT:  Okay.

25           MR. CARLEBACH:  -- so forgive me.

1          THE COURT:  But the problem is that the backdrop is

2     that there's an existing order that requires the return of the

3     funds, and that order has not been complied with, so that right

4     now, the debtor -- the principal of the debtor is in contempt

5     of an order of this Court.

6          MR. CARLEBACH:  I understand, but we are here today

7     seeking a stay of that order.  And the point I'm trying to make

8     is -- I mean, that the debtor is aware of the order, and I've

9     been told that it's just the money's not there, so to speak,

10    today.  It's not simply a question of contempt has certain

11    standards and, I mean, taxes were paid on this money.  And I'm

12    not justifying anything; I'm simply saying that from the

13    contempt point of view, if somebody takes a dollar and they go

14    into a grocery store and spend it, there's a question of

15    whether or not there's a -- whether contempt is the appropriate

16    remedy for that situation.

17         And like I said, I welcome Your Honor's suggestion

18    that some phone calls be made and we sit down with the trustee

19    to see what -- and talk.  And I thought the debtor's principal

20    would be here today, but he's not.  In any event --

21         THE COURT:  Yet another reflection of that

22    individual's view of this entire proceeding and this Court,

23    because one might observe that given the existence of the order

24    in which he stands in contempt, it would have been a good idea

25    to be here today.  But again, he elected not to do that.

1           MR. CARLEBACH:  With respect to the -- the stay will

2     not injure the estate.  I mean, nothing has moved since the

3     closing; nothing has happened.  Nothing is going to happen

4     today or tomorrow, and it --

5           THE COURT:  Mr. Carlebach, that's palpably incorrect.

6     The money -- the transaction closed, the money went into your

7     account --

8           MR. CARLEBACH:  Not my account, the DIP account.

9           THE COURT:  The DIP account, excuse me, and your

10    words, the debtor's principal has a strong personality and

11    insisted that you transfer the money.  The money wasn't

12    transferred inadvertently.  Inadvertence is when money falls

13    out of your pocket.

14          MR. CARLEBACH:  When I said that he insisted that the

15    money go to the DIP account versus my escrow account.  Had it

16    gone into my escrow account --

17          THE COURT:  And he took --

18          MR. CARLEBACH:  -- this never would have happened.

19          THE COURT:  He took the money out of the DIP account.

20          MR. CARLEBACH:  Correct.

21          THE COURT:  Okay.

22          MR. CARLEBACH:  He had signatory authority --

23          THE COURT:  Yeah.

24          MR. CARLEBACH:  -- lone signatory authority --

25          THE COURT:  Okay.

1          MR. CARLEBACH:  -- and he took that money.

2          THE COURT:  And also, not inadvertently, you managed

3    to keep enough money to pay your fees?

4          MR. CARLEBACH:  No, I did not.  He -- I asked him to

5    send me back sufficient money; he took everything, and I asked

6    him -- I said, pursuant to the order, I was required to keep at

7    least enough money to pay my fees.

8          THE COURT:  Well, pursuant to everything you were

9    required to not let him take the money out of the account.

10         MR. CARLEBACH:  I was not aware that he took the money

11   until we got the bank statements belatedly, and Your Honor,

12   can --

13         THE COURT:  Well, in other situations, what counsel

14   have done when they have a client who engages in that kind of

15   conduct, they come into court and they make a record that

16   they're in a bind because they owe -- there's an attorney-

17   client privilege, but that they're in a bind and one needs to

18   either resign and bring the conduct to the court's attention; I

19   mean, there's a whole body of law with respect to the

20   profession -- the requirements of the professional code of

21   conduct in this situation.  And instead, what's happened is

22   that the -- and there was a -- I believe there was a

23   declaration filed by -- is it Mr. Guarino?

24         MR. CARLEBACH:  Guarino, yes.

25         THE COURT:  Yeah, saying, basically, that he can't

1   comply because he's already given out the money; so two wrongs

2   don't make a right, and here we are.  And then we hear from Ms.

3   Cacuci that as far as she's aware, the transfer tax returns

4   were not paid, nor were the transfer taxes paid, and I don't

5   know what all the facts are on that, I only know what people

6   have said.  So we have those facts --

7              MR. CARLEBACH:  And --

8              THE COURT:  -- to deal with.

9              MR. CARLEBACH:  And I will address Ms.

10  Cacuci's -- after I've just made my initial presentation.

11              I believe the debtor has a substantial possibility

12  with being successful on appeal, and again, I'm not here to say

13  something inappropriate didn't happen; the question is, what's

14  the remedy?  And I believe that the appointment of a trustee,

15  in this case is draconian under all of the circumstances, where

16  like I said, at most the only creditor would be Ms. Cacuci, and

17  I'll explain why that is, but, Your Honor, there is not a real

18  creditor body in this case.  And rather than go through all of

19  this discovery, and all of this heavy-handed -- perhaps, had I

20  gotten a call from the trustee and we had sat down to talk

21  about something, but instead, we get an ex parte order

22  subpoenaing with a wrath of subpoenas, including a purchaser

23  and people who clearly were completely in compliance with court

24  orders, the co-op board, without a discussion, just serving

25  subpoenas.  I think that the remedy was stronger than necessary

Pg 17 of 101
199 EAST 7TH STREET, LLC.                          17

```
 1   to fix this problem here.

 2            And I'm not saying it wasn't a problem; procedure

 3   wasn't followed.  But it's a question of how hard to you hit to

 4   fix that?  And we take appointing a trustee and treating this

 5   debtor almost like they had committed -- I mean, we've all seen

 6   trustees going in the middle of the night with the marshal's,

 7   that's what seems to be happening here, and it's just

 8   complete --

 9            THE COURT:  Neither Mr. Berger nor Mr. Togut is going

10   anywhere in the middle of the night to do anything.

11            MR. CARLEBACH:  Well, an ex parte --

12            THE COURT:  They --

13            MR. CARLEBACH:  -- an ex parte order --

14            THE COURT:  Yes.

15            MR. CARLEBACH:  -- is -- to me, that's very serious.

16   Why couldn't have this --

17            THE COURT:  Yes, it's very --

18            MR. CARLEBACH:  -- been done on notice?

19            THE COURT:  It is very serious.  Well, by definition,

20   an ex parte order is not done on notice, and --

21            MR. CARLEBACH:  Because you're afraid someone's going

22   to escape the country in the middle of the night; that's --

23            THE COURT:  No.

24            MR. CARLEBACH:  -- when ex parte orders are granted.

25            THE COURT:  This was an ex --
```

1           MR. CARLEBACH:  No one's going anywhere here.  No

2    one -- that's not what happened.

3           THE COURT:  The ex parte order was presented and

4    granted because there was admitted conduct that was not in

5    accordance with the Code, the Rules, and this Court's order.

6    And in order to preserve the record, a order was presented for

7    the preservation of documents:  it's a status quo order; it's

8    plain vanilla, and it was entered.  Very simple, nothing

9    complicated about it.

10          MR. CARLEBACH:  Had it just been preservation of

11   records, I would have consented.  It's the subpoenas, which I

12   wasn't even served with a good portion of them, and all kinds

13   of parties; that's what I'm objecting to.

14          And finally, public policy favors a stay pending

15   appeal.  This was a successful case, it was a successful sale.

16   There were a lot of very prominent attorneys and law firms who

17   participated in it, and we're very pleased with the results.

18   Both the co-op attorneys were pleased with the settlement, the

19   stalking horse attorney, Mr. Karasik (ph.), was very pleased

20   with the way the case went, and his client got paid, and it

21   just seems that taking a successful case and converting it to a

22   Chapter 7 because of one mistake made by the debtor's

23   principal, it's like throwing the baby out with the bathwater.

24   This is a case --

25          THE COURT:  Well, and what one mistake are you talking

1  about --

2          MR. CARLEBACH:  I'm talking about the --

3          THE COURT:  -- because according to my file, and the

4  record of this case, there was one after another after another.

5  There were no operating reports; there was a failure to comply

6  with the sale order; there was no procedures followed after the

7  sale; there was the sense that the case was just going to

8  somehow be over when the monies were all distributed.

9          That's not the way it works.  When you come into

10 Chapter 11, you have to leave through an appropriate exit.

11 Appropriate exit is usually a plan or a liquidating plan.  In

12 very rare instances, there's a dismissal, but you don't do

13 whatever you want, and then say no harm/no foul.

14         I have to tell you that even if that were okay with

15 me, it's not okay with the U.S. Trustee who has pretty

16 consistently taken the view that you have to follow the Code

17 and the Rules.  And on top of that, Ms. Cacuci is here telling

18 me -- and I don't know what all the vets are -- that the

19 transfer tax has not been paid.  Now, had the debtor followed

20 the plan, perhaps they wouldn't have even had to pay the

21 transfer tax; it's a very curious thing.  It's a very curious

22 thing.

23         A plan in this case, I'm quite sure what you have on

24 your system, you could've pushed a button, you could've filed a

25 five --

1           MR. CARLEBACH:  Ms. Cacuci would disagree with that.

2    And --

3           THE COURT:  But the --

4           MR. CARLEBACH:  -- I understand.

5           THE COURT:  -- transfer taxes haven't been paid, and

6    in one of the pleadings that you filed, you suggest that that

7    can't be laid at the debtor's doorstep.  I would suggest to you

8    that it absolutely is laid at the debtor's doorstep to ensure

9    that everything incident to the transaction is taken care of.

10   So right now, as far as I'm aware, the transfer taxes haven't

11   been paid.  There were creditors; I don't know if they've gone

12   away, I don't know how they got paid, I don't know anything.

13   All I know is what you've told me, which is the debtor with his

14   strong personality, insisted that he keep all of the money,

15   except for the money you intend to apply for fees, and that he

16   then took the money and then subsequently transferred it, and

17   now can't get it back.

18          So we're on the public interest prong.  What's your

19   argument for the public interest?

20          MR. CARLEBACH:  Very briefly, Judge, we did file

21   operating reports.  We stopped at some point, the debtor

22   stopped filing.  The debtor generally, during the active part

23   of the case did file reports.  Not justifying the fact that it

24   stopped, but to say that it didn't file any reports is

25   incorrect; it filed reports for a good portion of the case.

1        Secondly, the issue of the sale was a

2    misinterpretation.  I viewed the postponement clause as

3    something which gave me the right to cancel a sale; Your Honor

4    disagreed.  There was no misconduct there, it was a question of

5    interpretation.  And I know Your Honor's view, I don't want to

6    go over it, but all I'm saying is that only -- the reason you

7    converted this case, and I -- is because of the inappropriate

8    distribution.  And --

9        THE COURT:  You said the reason I converted the case

10   is because I have personal animus, hostility, ill-will, I don't

11   know, there are probably a basket of adjectives that you used

12   to describe me.  When in fact, I can --

13       MR. CARLEBACH:  Your Honor, I'd prefer --

14       THE COURT:  -- I --

15       MR. CARLEBACH:  -- if you -- I don't want to go into

16   that on the record.  I put it in -- I've said whatever I felt I

17   had to say, and this is not the first case that I have had

18   issues with -- again, the question of degree of response;

19   whether or not something happens in a case, you have a case

20   where I have created, as debtor's counsel tremendous and

21   unexpected value, and because of what I view as a hyper-

22   technical infraction -- and I'm referring to that other

23   case -- something happened and suddenly we have a trustee, and

24   all the value I've created went to the trustee in that other

25   case.  And that's why I'm deeply concerned that all the value

1  that was created for equity here is going to go out the door in

2  fees and commissions.

3          And again, it's a question of do you throw out the

4  baby with the bathwater; do you just completely become

5  oblivious of the economic reality because --

6          THE COURT:  I'm not oblivious to --

7          MR. CARLEBACH:  -- somebody did something --

8          THE COURT:  I'm not oblivious to anything, Mr.

9  Carlebach.  I am not inclined in this case, or in any case, to

10  without consequence, allow a case to be conducted other than in

11  accordance with the Code, the Rules, and my order.  Otherwise,

12  the rule of law goes by the wayside and I might as well not

13  show up to work.  And even if I were inclined to let it go,

14  call it no harm/no foul, the U.S. Trustee, I think, would take

15  a different view.

16          So I think, why don't you pause unless you have more

17  to say, and I'd like to hear from some of the other parties?

18  Did you have more to say?

19          MR. CARLEBACH:  I just wanted to respond briefly to

20  Ms. Cacuci.

21          THE COURT:  Sure.

22          MR. CARLEBACH:  With respect to the transfer tax, I

23  submitted a declaration when -- there was even a suggestion

24  that there was no closing.  I submitted all the closing

25  documents last night, which included all the transfer tax

1   documents that were given to us by the title company.  A

2   closing report that was prepared by the purchaser's attorney,

3   and all of these documents were given to me October 29th, the

4   day of the closing, which was conducted at the debtor's

5   principal office.  A closing statement given to me by the title

6   report company, which primarily consisted of transfer tax of

7   city and state, and a check that I gave to the title company on

8   that day.

9        And why they haven't paid the City is beyond me.  Why

10  they haven't filed a transfer tax returns, I shouldn't say it's

11  beyond me, they claimed they were missing some information.

12  That money should have been paid to the City, and again, the

13  debtor did everything it needs to do.

14       THE COURT:  Don't you think it was the debtor's

15  responsibility to make sure that its obligations to pay

16  transfer taxes was discharged by the title company?

17       MR. CARLEBACH:  Your Honor, honestly, I've never had a

18  situation at a closing where I gave a title company a check and

19  they didn't do with it what they were supposed to; it's just

20  never happened.  And again, that is something that would be so

21  simply remedied in terms of, we can go back to the title

22  company and find out why they didn't pay it, and what needs to

23  be done to get them comfortable to pay the City.  Again, that

24  doesn't need a Chapter 7 trustee.  And again, the question

25  is --

1          THE COURT:  You didn't do it before, nobody did it.

2          MR. CARLEBACH:  Well, I'd like --

3          THE COURT:  And until the U.S. Trustee's office filed

4     their motion, we had no idea what was going on.  So the

5     suggestion that the party who didn't diligently pursue the

6     completion of the transaction and the conclusion of the case

7     should continue to be trusted to do all of that is a little

8     odd.  And that goes to the very circumstances under which it is

9     justified to appoint an independent fiduciary; in this case, a

10    Chapter 7 Trustee, to see that those things get done and to

11    answer all of the unanswered questions.

12         MR. CARLEBACH:  At what cost to the estate, Judge?

13         THE COURT:  Well, that's the --

14         MR. CARLEBACH:  At what cost because it doesn't

15    matter.  If it costs the trustee 500,000 dollars in fees to

16    administer this estate --

17         THE COURT:  Mr. Carlebach, in a million years and on

18    no planet is it going to cost this trustee 500,000 dollars to

19    administer this case.

20         MR. CARLEBACH:  I mean, I really wonder how much money

21    the trustee has already -- there were six attorneys on their

22    email chain, there were ten subpoenas served, these

23    are -- again, I've dealt with practical trustees in the Eastern

24    District of New York, and a phone call gets made and people

25    talk about things.  This is feeding at the trough, Judge, this

1   is going to be -- it's got all the --

2           THE COURT:  Mr. Carlebach, I'm going to let Mr. Berger

3   respond to your comments.  I find them unsupported,

4   inappropriate, and contrary to this Court's experience with

5   trustees across the board.  There are a lot of ways to make a

6   lot more money.  Moreover, as I said before, they don't get

7   paid without my approving their fees, so there's zero risk of

8   this becoming a feeding frenzy over a narrowly defined set of

9   issues; period.

10          So I suggest we stop talking about that.  Somebody has

11  to figure out how to make this right, whether it's you or Mr.

12  Berger, the cost is not going to be any different; it's not

13  going to be any different.  The debtor forfeited its right to

14  continue to oversee the case by failing to comply with the Code

15  and the Rules.  We're here on a motion for a stay pending

16  appeal.  We've now kind of varied all over the place.

17          Do you have anything else on the public interest

18  prong?

19          MR. CARLEBACH:  I do not, Your Honor.

20          THE COURT:  Okay, well, let's hear from Ms. Cacuci to

21  find out what she knows, even though, technically speaking, I

22  suppose it only goes to the prong of the likelihood of success

23  on appeal.  So Ms. Cacuci, what do you know about the --

24          MS. CACUCI:  Your Honor --

25          THE COURT:  -- transfer taxes?

1      MS. CACUCI:  -- the email with -- as I said in my

2  letter --

3      THE COURT:  Can you pull that microphone towards you,

4  please?  Thank you.

5      MS. CACUCI:  I'm sorry.  Whatever I said in my letter,

6  Your Honor, obviously, is just based on my review of records

7  kept by the Department of Finance in the ordinary course of

8  business.  I personally have no knowledge of anything --

9      THE COURT:  Okay.

10      MS. CACUCI:  -- on my own.  Also, as I mentioned in

11  the letter, just looking at the docket, the City had not been

12  involved at all in this case; from the beginning, it should

13  have been.

14      THE COURT:  Well, what's the basis of your statement

15  that it should have been?

16      MS. CACUCI:  Because if the debtor anticipated selling

17  a property, the City always participates to make sure the

18  transfer tax gets paid, and so we'd collect the transfer tax

19  for the state, as well, so even though otherwise, it seems like

20  the City would not have been a creditor here, he would have a

21  potential administrative claim.  But besides that, the sale

22  order -- and I was just looking at it again, again, after the

23  fact, it claims that we got notice; we had no notice.  So the

24  sale order is incorrect, I'm assuming the debtor's counsel

25  prepared it, we never had a chance to review it or anything,

1    but it specifically says that the taxing authority had notice.

2          I attached the certificates of service to my letter,

3    just as an example, we didn't have notice, we didn't know

4    anything about this case until I got a call from the U.S.

5    Trustee's office.  At that time, since he was in court, you

6    know, there was not a whole lot I could do, I called the title

7    company, Infinity Land Services, and I spoke with this person,

8    Michael -- I'm not sure how to pronounce his name -- Wolgemuth

9    (ph.), or something like that, just asking if -- because I saw

10   there was a reference to the transfer tax in the amount of

11   23,512.50, if that was paid because you always go back to the

12   title company.  And he said no, it was not paid, so he told me

13   that, and they said there was insufficient money.  I don't know

14   insufficient money for what.  At the time, I didn't know about

15   this check or anything like that.

16         Now, in response to the motion to -- for a stay

17   pending appeal, I decided to look further yesterday to see if I

18   could clarify this.  So what you do when there is any kind of

19   transfer property, the Department of Finance is the repository

20   of the transfer property data about any transfers of property

21   in the City of New York; it's called ACRIS.  It's a

22   computerized system, I can show it to the Court how it works.

23   You basically, log in and then you put a property address.  In

24   this case, because there are co-op units, you put the co-op

25   unit, and then you see what's there:  if their mortgage is

199 EAST 7TH STREET, LLC.                                    28

1    recorded, if deeds have been transferred, if UCC.  Everything

2    should be reflected in there.

3             It was blank, for these units; there was nothing.

4    There's just nothing, no record whatsoever.  That's all I can

5    testify to:  that I reviewed it, it's nothing there.

6             Also, to clarify, it used to be many, many years ago

7    that the real property transfer tax returns were being

8    submitted manually.  It's not the case, it's the same as with

9    the electronic filing bankruptcy court.  If you look at the

10   Department of Finance website, it says clearly, it has to be

11   filed electronically, there are instructions how to fill out

12   the form, so on and so forth, the tax applicable; everything is

13   on the website.  The return has to be filed electronically no

14   later than thirty days of the closing date.

15            If in fact, there had been a real property transfer

16   tax return, the one that he presented last night, or a

17   different one -- and I want to go back to that point -- it

18   should have been filed.  It should've been electronically

19   filed.  There is -- just as with any other tax; you can't say I

20   paid the tax if you don't have a tax return to show.  The

21   Department of Finance couldn't apply any funds unless there is

22   a real property transfer tax return that says, okay, you're the

23   seller, you're the purchaser, here's the consideration.  They

24   need to review and make sure that the tax is appropriate, that

25   the tax rate is correct, and so on and so forth.

1          So there's nothing that I could see on ACRIS.  I did

2    contact the person who I understand is the director of the unit

3    to make sure that what I saw is what she saw.  And she

4    confirmed that she saw nothing.  That's all I can say.

5          Now --

6          THE COURT:  I have a concern, I --

7          MS. CACUCI:  I would like to go back --

8          THE COURT:  Just let me --

9          MS. CACUCI:  -- yeah.

10          THE COURT:  -- before I forget this.

11          MS. CACUCI:  Okay.

12          THE COURT:  The document that Mr. Carlebach filed at

13    docket 103, which attaches what --

14          MS. CACUCI:  The closing documents.

15          THE COURT:  -- what --

16          MS. CACUCI:  Yeah.

17          THE COURT:  I'm not sure exactly what it is, but --

18          MS. CACUCI:  Right.

19          THE COURT:  -- it's documents related to closing.  It

20    appears to have at least one Social Security number on it, so

21    to the extent that this was filed on the docket, that's a bad

22    thing.  So that needs to be taken care of; you need to go

23    through this page by page.  We need to do something about this.

24          MR. CARLEBACH:  I'll take care of that, Your Honor.

25          THE COURT:  Well, it's above my pay grade, but we'll

1   take care of that for that sake of that individual.

2        MS. CACUCI:  Okay, so I would just like to

3   point -- again, I just looked at this now, I've been to many

4   closings on behalf of the City.  I'm not a title company

5   attorney, but I doubt -- first of all, this is not on file

6   anywhere --

7        THE COURT:  Okay.

8        MS. CACUCI:  -- number one.  Number two, the real

9   property transfer tax return has blanks everywhere; it's not

10   signed, it's not dated, it's not sworn to, the names of the

11   parties are completely different from what's in the sale order.

12        THE COURT:  Correct.

13        MS. CACUCI:  I don't know who they are, I don't know

14   what this is about.  I doubt that a title company would have

15   accepted something like that, or that they would've been able

16   to file it.

17        THE COURT:  Well, I noted the same things that you

18   did, but I'm not an expert --

19        MS. CACUCI:  But just so that you --

20        THE COURT:  -- but I agree with your observations.

21        MS. CACUCI:  The estimate that we had referred to

22   transfer tax to New York City, 23,512.50.  Now, unless this is

23   viewed -- and I would have to go back and talk to Finance about

24   that, the rate is 1.425 percent, and that would be 23,512.50

25   because it's not a commercial, but rather they're residential

1  units.

2          THE COURT:  Right.

3          MS. CACUCI:  I don't know -- and I didn't know since I

4  hadn't been involved, that this was one purchaser for all the

5  units, I don't know whether that would be deemed commercial.

6  But I would point out that this return that was supposedly

7  filed then, aside from the blanks and so on -- has a different

8  rate of 2.65 percent that applies to commercial, not

9  residential.  So that would be in conflict with what was

10 previously provided --

11         THE COURT:  All right, I think that the --

12         MS. CACUCI:  -- by the title company --

13         THE COURT:  -- the number on this document looks like

14 it's 43,000 dollars.

15         MS. CACUCI:  Right, which would be the other rate --

16         THE COURT:  Yes.

17         MS. CACUCI:  -- the 2.65 percent.

18         THE COURT:  Right.

19         MS. CACUCI:  So if --

20         THE COURT:  I think the bottom line is --

21         MS. CACUCI:  -- even the check that was sent, if it

22 was --

23         THE COURT:  -- there are many unanswered questions.

24         MS. CACUCI:  Right, the check was for 30,462, which is

25 the figure that appeared here, but then this would be in

1   conflict with what's in this -- so I don't want to say more,

2   but this seems to be --

3            THE COURT:  Okay.

4            MS. CACUCI:  -- recently prepared --

5            THE COURT:  All right.

6            MS. CACUCI:  -- by somebody who doesn't have knowledge

7   to really prepare it.

8            THE COURT:  Okay, I --

9            MS. CACUCI:  Thank you.

10           THE COURT:  All right, Mr. Masumoto, would you like to

11  go next?

12           MR. MASUMOTO:  Yes, Your Honor.  Thank you.

13           Good morning, Your Honor, Brian Masumoto of the Office

14  of the United States Trustee.

15           Your Honor, most of our comments regarding the stay

16  pending appeal contained in the document that we actually

17  filed, I would like to highlight one point that I didn't

18  specifically amplify.  But although some of the deficiencies in

19  this case may be regarded as technical, I do believe that under

20  these particular circumstances, they're more than just sort of

21  technicalities.

22           For example, the filing of the operating reports, in

23  this case, none of the operating reports are filed after, as

24  far as I can tell on the docket, and even based on response for

25  months after July of 2015.  I believe prior to that, from

1  December 2014 to May of 2015, reports are filed.  I believe the

2  June report has not been filed, the July report was the last

3  official report listed on the docket.

4        In the debtor's response to our motion to convert or

5  dismiss, he did attach the bank statements for the months of

6  November 2015 through February 2016.  But the bank statements

7  or any financial data for the months from October to August

8  were not included.  So in fact, the amounts that were allegedly

9  wired to the debtor's DIP account in October when the sale

10 closed have not been evidenced so far by any sort of bank

11 statements.

12       And in this case, one of the things that was a matter

13 of concern and I had some difficult in working through the

14 numbers, as we indicated in our objection, the amounts

15 distributed to the identified members, there are four members:

16 the profit share, the JD Guarino profit sharing, there was an

17 Elliott Realty Company, and Linda (ph.) and Mary (ph.) Guarino,

18 with different percentages.  Those percentages reflected in the

19 statement of financial affairs do not correspond to the amounts

20 of the distribution.  Now, without -- there were payments to

21 other than those four individuals, there are payments to a

22 company related to the principal who may have been performing

23 maintenance services in the course of the case.  And there were

24 other entities that I don't -- I'm not able to identify as of

25 this time.

1        But there are more than just the distribution to the

2    four members, and that concerns us for a number of reasons, and

3    why the reports --

4        THE COURT:  Are there different names on this transfer

5    tax return to?

6        MR. MASUMOTO:  Well, there was -- yes, it was

7    4C -- there was some --

8        THE COURT:  Sure.

9        MR. MASUMOTO:  -- some initial related.  I'm not sure

10   if that was just a designation reflecting the apartment

11   numbers, perhaps.

12       THE COURT:  I see.

13       MR. MASUMOTO:  Or, I mean, it's not clear, the buyer

14   is listed as 4C 199, there is an apartment 4C, so I -- as with

15   the other parties, I'm not sure whether the designations were

16   attempting to reflect some sort of connection with the actual

17   purchased units, or not --

18       THE COURT:  Okay.

19       MR. MASUMOTO:  -- but we do know that there are

20   inconsistencies.  But the concern that was raised with respect

21   to the bank statements that were provided showing the

22   distributions, there were distributions not just to the four

23   members, but to others, which would then suggest possibility

24   again, it was not explained, is it possible that there were

25   administrative deficiencies that occurred during the course of

1  the case prior to the sale, which were unpaid.  We don't know

2  that without the operating reports, and so we have no idea

3  whether the distributions and the payments other than the

4  members were appropriate.  Or perhaps, again, it's the

5  principal who did it; the debtor's counsel wasn't there to give

6  advice, perhaps the debtor or the members felt that they owed

7  monies to different entities, and they wanted their

8  distributions to be reduced by the payments, since from their

9  perspective, it's their funds.

10      The concern there is the amounts that were distributed

11  to the individuals may be, technically, underreporting their

12  actual income.  And so, although as counsel has indicated,

13  taxes were paid, the concern is, without the operating reports

14  and the reconciliation of all of the proper payments, in fact,

15  they may have underreported the income.

16      Now, I'm not saying that happened, but just looking at

17  the information that's provided, certainly, that raised a

18  concern and a possibility.  Now, this is not something that --

19      THE COURT:  Well, there's also been a representation

20  that there are no creditors, and by that, I think we're talking

21  about pre-petition creditors.  That's not clear to me that that

22  is actually the case.

23      MR. MASUMOTO:  Yes, Your Honor, and again, in our

24  objection, we tried to address that.  I believe in the

25  declaration filed by Mr. Guarino, he indicated that the filed

1    claims by Mr. Brett Komar (ph.) and Laurence Gottlieb (ph.)

2    were taken care of.  Mr. Gottlieb, through --

3            THE COURT:  But what does that mean, taken care of; do

4    you know?

5            MR. MASUMOTO:  I believe the declaration indicated a

6    payment by third party, again, raising concerns as to whether

7    or not that might have been one of the members who, ultimately

8    would have been an indirect recipient of the debtor's funds.

9    And again, I believe the declaration did not disclose when

10   those claims were resolved, and therefore, could easily or

11   possibly have been resolved even after the case had been

12   converted.

13           One of the concerns in terms of the administration of

14   this case is, there seems to be a disregard for what's regarded

15   as not real creditors, and I'm not quite sure how that's

16   characterized, but it seems to be any governmental creditor is

17   not a real creditor, and therefore, arguably, the transfer tax

18   is not something that there is concern about.  And as we

19   mentioned in our case, it appears that no provisions were made

20   for the payment of the U.S. Trustee fees, which in this case

21   would have been significant, given the sale for 1.6 million

22   dollars.  And while debtor's counsel made clear that he made

23   provisions to ensure that his compensation was provided for, I

24   believe in the February 2016 report, the balance in the DIP

25   account was 29,000 and change.  Obviously, not enough to pay

1  him his agreed compensation with is client of 30,000 dollars,

2  so what happened in --

3       THE COURT:  So his agreed compensation with his client

4  is neither here nor there, they don't get to decide.

5       MR. MASUMOTO:  I agree, Your Honor, but it suggests to

6  me, and it's hard to believe that at that point debtor's

7  counsel was not aware -- could not possibly have been ignorant

8  of the fact that there would be nothing in the account.  There

9  was insufficient funds to pay his 30,000 dollars, funds were

10  wired in to cover the 30,000 dollar check -- the wire to

11  counsel, plus an extra 35 dollars, presumably, a service

12  charge.

13       So it's hard to believe at that point, debtor's

14  counsel was not aware that the DIP account no longer had any

15  funds and that the funds had been distributed.  Now, I would

16  think certainly, if counsel had been filing the operating

17  reports on a monthly basis, he would certainly have known it

18  even earlier, since the disbursements occurred, according to

19  the bank statements, in November.  So had he been monitoring it

20  and filing operating reports on a timely basis, it would have

21  been in November when he realized that these distributions were

22  occurring.

23       Now, once he determined that the distributions had

24  occurred, he clearly had to know that he was responsible for

25  the administration of the estate.  And I think there was some

1   suggestion earlier, and even now in terms of like how quickly

2   this case can be resolved, the question is, why wasn't it done

3   at that time?  As soon as counsel determined that there weren't

4   funds in the estate, he certainly preserved his compensation,

5   didn't even provide for the potential liability for U.S.

6   Trustee fees, and as indicated, --

7             THE COURT:  It should have never --

8             MR. MASUMOTO:  -- did not appear --

9             THE COURT:  -- gotten beyond that point.  You don't

10   get to allow the principal of a debtor to take money out;

11   period.  There's no conversation after that.  One of two things

12   is true:  You either failed to give the advice, not good; or

13   you give the advice and it's ignored, also, not good.  There's

14   no -- there's nothing that happens after that moment that is

15   justifiable; period.

16             MR. MASUMOTO:  I understand.

17             THE COURT:  So if it's a matter of being hyper-

18   technical; I'm hyper-technical.  So the way it works in this

19   building is that if you come in here and you seek Chapter 11,

20   and you seek to have a court order and sell your property, you

21   have to leave by the front door according to the rules.  So all

22   of this speculation as to could of, would of, should of, and

23   when, I hear you, but -- and your office was kept in the dark,

24   and certainly, I have too many cases in order to day by day by

25   day say to myself, oh, I haven't gotten a plan or an order or a

1   this or a that in any particular case; I can't function that

2   way, I have to rely on the parties and counsel to do their job.

3   And frankly, sooner or later, the Office of the U.S. Trustee,

4   if nothing happens in a case, shows up and makes an appropriate

5   motion, which is exactly what happened here, which is what

6   caused me to then say, oh, dear, what happened here, we didn't

7   hear anything after the sale.

8          So that's where we are, so could you respond to the

9   suggestion that this is much ado about nothing, and we should

10  just have a couple of phone calls and be done?

11         MR. MASUMOTO:  Well, Your Honor, I believe that the

12  administration of this case still has to be completed, and it's

13  something which hasn't been done and, obviously, one of the

14  reasons why we certainly supported the conversion of the

15  Chapter 7.  As Your Honor knows, when we filed our motion

16  originally, because we had no evidence of the sale taking

17  place, we recommended dismissal.  As soon as we learned that a

18  sale did take place, and the funds had been disbursed, we

19  immediately communicated to counsel, in fact, the original

20  hearing was on June 28th, and although we were asked to consent

21  to an adjournment, we declined once we discovered that, in

22  fact, the circumstance that Your Honor discussed had occurred.

23         And so from our standpoint -- well, and subsequently,

24  as Your Honor knew, prior to the August 8th hearing, we filed a

25  supplement changing our recommendation under the circumstances

1  to a conversion.

2         THE COURT:  Mr. Carlebach, is that important what

3  you're doing on your phone?

4         MR. CARLEBACH:  Somebody just advised me that there

5  was a major train crash in New Jersey.

6         THE COURT:  Yes, New Jersey Transit train crashed into

7  the station in Hoboken.

8         MR. CARLEBACH:  Somebody inquired about my safety.

9         THE COURT:  I'm sorry?  I'm sorry?

10         MR. CARLEBACH:  I said somebody -- a family member

11  inquired about my safety; that's what I was just doing.

12         THE COURT:  All right, have you let them know that --

13         MR. CARLEBACH:  Yes.

14         THE COURT:  -- you're okay?

15         MR. CARLEBACH:  Yes.  Yeah.

16         MR. MASUMOTO:  Again, so accordingly, Your Honor, we

17  believe that the case -- there's still questions about the

18  administration, and as far as the -- I'm hopeful that with the

19  cooperation of the debtor that, in fact, the administration can

20  be accelerated.  Like, for example, Your Honor, at the time of

21  the August 8 hearing, as Your Honor knows, we only knew about

22  the debtor's response at 6:20 that morning, and so we had a

23  limited amount of time.  I had time enough to contact Ms.

24  Cacuci to determine whether transfer taxes had been paid, but

25  certainly not enough time to examine the documents.  However,

1    from my standpoint that what appears to be as part of this

2    motion to stay is a position or a threat by the debtor to

3    essentially fight the trustee at every step of the way of the

4    administration, which in fact, again, as we use the term, would

5    seem to generate a self-inflicted injury that they were

6    complaining about.  They --

7              THE COURT:  Well, it seems that the goal -- goal is

8    the wrong word -- the concept is that it's impossible to return

9    the money, and that's the end of the story.  That seems to be

10   the bottom line, and that's just not the way it works; that if

11   the party refuses to return the money pursuant to my order,

12   they will be in contempt; period.  And then the question is,

13   what is the appropriate sanction?

14              No one has made any suggestions to me yet, but the

15   fact that as a factual matter, the party is in contempt.  I

16   believe the deadline for returning the funds passed before the

17   motion to stay was made.  So there's a contempt, and I'm very

18   well versed in the law, there has to be a clear violation of an

19   unambiguous order.  There was nothing ambiguous about the order

20   requiring that the funds be returned; the only response has

21   been, it's impossible.  Okay, it's impossible.

22              So we're going to keep going.  Is there anything else

23   you wanted to say, Mr. Masumoto, that you haven't --

24              MR. MASUMOTO:  No, Your Honor, again --

25              THE COURT:  -- that your office --

1           MR. MASUMOTO:  -- just to --

2           THE COURT:  Did you read the second pleading that was

3    filed by Mr. Carlebach?

4           MR. MASUMOTO:  Yes, Your Honor, if it's the one in

5    which there were allegations of perjury by the U.S. Trustee.

6           THE COURT:  Yes, would you like to address the

7    allegation of perjury by the U.S. Trustee?

8           MR. MASUMOTO:  Well, Your Honor, I wasn't present at

9    the particular hearing or in the case that's at issue, but in

10   fact, I believe our -- as you can see in the courtroom, one of

11   our trial attorneys who was present is here, but my

12   understanding is we certainly don't understand the allegations

13   of perjury that was asserted in that case, and we certainly

14   dispute any such characterization.  The other references in

15   this case were not specific accusations except, I suppose, the

16   implications that I'm particularly soft on my objections

17   regarding the Togut firm and their fee applications, and I

18   don't think I need to response to that.

19          We certainly object to any of the characterizations

20   suggesting that our office has any sort of bias or has acted

21   improperly in any of the cases that's mentioned in this

22   objection filed by the debtor.  And we would be happy to

23   response to any further questions or inquiries regarding any of

24   the statements made, but as a -- for the matter of the record,

25   any suggestions that we acted improperly or inappropriately, we

1  categorically deny and object.

2          THE COURT:  Okay.  All right, thank you.

3          MR. MASUMOTO:  Thank you, Your Honor.

4          THE COURT:  Mr. Berger?

5          MR. BERGER:  Good morning, Judge.

6          THE COURT:  Good morning.

7          MR. BERGER:  Again, Neil Berger for the trustee.

8          I covered a lot of ground, but I think that what the

9  current conversation focuses on is the stay pending appeal and

10 a number of the issues that were raised in connection with

11 that, and I'll try to address them as best I can in the order

12 that they were raised.

13         First by way of introduction to the case, we are the

14 newest players in the case.  Mr. Togut is an extremely

15 qualified and experienced trustee; he has been a trustee since

16 there was a panel of trustees.  He has been a trustee for

17 nearly forty years.  I have been representing trustees for more

18 than thirty years:  we know how to do Chapter 7 cases; we know

19 how to do investigations; we know how to do them very

20 efficiently.

21         The concern articulated by the debtor in support of

22 its concern for irreparable harm seems to be a self-fulfilling

23 prophecy.  The investigation in getting the estate from an A

24 point to a B point is very capable of being done efficiently.

25 If the debtor and the attorney for the debtor cooperate with

1   our request for documents and information, once we have those

2   documents and the information, we'll be able to tell the Court

3   and parties-in-interest the best way to resolve this case.  The

4   concern we have, Your Honor, is that there seems to be an

5   unwillingness to cooperate with the process that you set in

6   motion, the United States Trustee appointed a trustee, the

7   debtors moved for a stay pending appeal.

8            We've heard from Ms. Cacuci, and I observed the same

9   things in the draft documents that were attached to Mr.

10  Carlebach's late-night filing that the calculation of transfer

11  taxes and recording taxes ranged anywhere from 20-odd-1,000

12  dollars to 40-some-1,000 dollars, questions need to be

13  answered.  We issued subpoenas, Mr. Carlebach raises a concern

14  that he wasn't served with subpoenas.  There's simply no secret

15  that we issues subpoenas, we filed affidavits of service on the

16  document.  Mr. Carlebach's argument seems to be misplaced.

17  Parties need not be served with subpoenas in a Rule 2004

18  examination.  I believe what he is citing to, and I think his

19  papers cite 2045, which is a rule that pertains to adversary

20  proceedings made applicable in this Court.

21           So the issuance of subpoenas was procedurally correct,

22  there's a proper basis for the issuance of subpoenas because we

23  have serious questions whether or not taxes were paid, whether

24  or not the proper calculation of taxes was made, whether or not

25  there are taxes other than what we've seen so far, whether or

1   not there were creditors in existence other than that we have

2   seen.  The debtor continues to argue that there weren't

3   creditors in the face of what we see as actual evidence that

4   there are creditors.  So the fact that we issued subpoenas is

5   standard operating procedure when we have a debtor who's been

6   less than candid with documents and information.

7           I should add, Your Honor, that in addition to

8   complying with your scheduling order, your order to show cause,

9   granting the trustee 2004 examination power, we served the

10  subpoenas by Federal Express.  In addition, we sought to serve

11  the debtor and the members by personal service at the 777 Third

12  Avenue address, as listed in the debtor's petition.  When our

13  paralegal went to the building, we were told that the debtor no

14  longer maintains a place of business at that building; that

15  raises some flags in our mind.  A million dollars appears to

16  have gone -- not appears -- a million dollars went out of the

17  estate without court authority, disclosure of that fact was

18  concealed or not disclosed for any number of months, and now we

19  have a debtor that no longer maintains a place of business

20  where it listed a place of business in its petition.

21          That's the subpoenas.  I think I've addressed

22  adequately, potential cost, Your Honor correctly observed that

23  fees and expenses sought by a trustee and his retained

24  professionals are subject to scrutiny by the United States

25  Trustee, and Your Honor, and parties on notice to all about

1    creditors and parties-in-interest.

2          Mr. Carlebach also addressed concern about the trustee

3    having sought Rule 2004 relief and conjunctive relief on an ex

4    parte basis.  First, Your Honor, a Bankruptcy Rule 2004

5    expressly authorizes a motion -- ex parte motion, it doesn't

6    say the words -- but there are other provisions in the Code and

7    the Rules that require a notice and a hearing.  Bankruptcy Rule

8    2004 does not.  We cited case law, Judge Gropper, District

9    Judge Marrero, affirming Judge Drain in the Metion case, Judge

10   Eisenberg in an Ohio case, it is common practice.

11         We also articulated with particularity in our

12   application why we thought ex parte relief was appropriate.

13   There is an understandable concern on the part of the trustee

14   for the preservation documents.  Filing a Rule 2004 application

15   which seeks relief in the form of preservation of documents as

16   a public document before entry of an order, may provide

17   incentive or an opportunity for parties who are predisposed to

18   conceal or hide or destroy documents to actually do that.  So

19   we would have defeated the actual purpose of the injunctive

20   relief that we're seeking.

21         And again, Your Honor, we build in protection for

22   parties who receive notice of Your Honor's order and the

23   subpoena because they have an opportunity to come into court

24   and say either, I don't like the subpoena, I don't have

25   information, I shouldn't be bound by Your Honor's preservation

1   order.  I can't imagine, Your Honor, why a party who is

2   required under Section 542(e) to turn over documents to the

3   trustee; I can't understand why any party would have an

4   incentive based upon a proper relief that documents should be

5   destroyed.  It is clear in the statute, in the case law, books

6   and records of the debtor, and books and records that contain

7   information concerning property of the estate must be turned

8   over to the trustee.

9          So far, as Mr. Carlebach's concern about ex parte

10  relief, we've complied with the statute, we've provided

11  procedural relief, the parties have received, Your Honor, in a

12  subpoena, so to the extent that there was any concern about ex

13  parte relief, parties are adequately protected.

14         THE COURT:  So Mr. Carlebach's response to all of that

15  is, you should just pick up the phone and everything will be --

16         MR. CARLEBACH:  That was not my response, Judge.  That

17  was not my response.

18         MR. BERGER:  Your Honor, I received a telephone call

19  from Mr. Carlebach shortly after the trustee's appointment, and

20  the proposal was his client and he was -- it was a businessman

21  and maybe we can work something out.  My response was that

22  there was an August 8th direction from Your Honor for the

23  return of all of the funds to the estate, and there was an

24  extant order, and I didn't have the power, and nor did my

25  client as trustee, have the power to modify Your Honor's order,

1   and that the first step would be a conversation about how

2   compliance would occur with that order.  That's where the

3   telephone conversation ended.

4        There's been no offer for compliance, we haven't been

5   contacted about compliance with our subpoenas or supplying

6   documents and information so we can begin what should be an

7   efficient administration of the estate.  If documents and

8   information are provided to us, and we have a clear picture of

9   what the debtor's financial affairs are and were, we can pick

10  up the phone to Mr. Carlebach in his office in New York, I

11  believe he lives in Brooklyn, we can go anywhere and have a

12  conversation and see how this case ought to proceed on notice

13  to Your Honor and other parties before anything is done.  So

14  there is a process.

15       Mr. Togut and I have been involved in thousands of

16  Chapter 7 cases.  A key note is transparency; something that

17  didn't occur in the Chapter 11 case, and something that screams

18  to be done in the Chapter 7 case.  So once we have documents

19  and information, sure, we're happy to have a conversation, see

20  how compliance with Your Honor's order can be made.

21       THE COURT:  Okay, thank you.

22       MR. BERGER:  As to a public interest, Your Honor,

23  there's an extraordinarily strong public interest in having

24  bankruptcy estates administered pursuant to the Code and the

25  Rules by an independent fiduciary, especially in a Chapter 7.

1    We didn't see that there, so the public policy certainly favors

2    having a trustee administer this estate.

3            Your Honor, on standing, we don't need to draw a

4    conclusion today on standing.  We included that case law simply

5    to illustrate that as the scales tip, we don't believe that the

6    debtor had authority to file the notice of appointment.  The

7    case law that we filed stands for the proposition that once a

8    trustee is appointed, he alone has the authority to pursue

9    litigation; that's consistent with Section 363 of the Code.

10   The case that Mr. Carlebach mentioned that we cite, also, is

11   South Edge, LLC, and this debtor is an LLC, specifically

12   addressed the ability of a debtor to appeal and follow up with

13   the Tenth Circuit case and the WC case that we filed to say

14   that a corporate entity no longer has standing to file a notice

15   of appeal once a trustee is appointed.  And the South Edge case

16   also addressed the instance where members failed to file a

17   notice of appeal, and that's what we have here.

18           It's difficult, Your Honor, to understand how the

19   members, especially the managing member of this debtor, had no

20   idea that there was a motion to convert, or the possibility of

21   a trustee being appointed when the U.S. Trustee's motion was

22   filed last May and the hearing was adjourned until August.

23   Now, certainly there was an adequate opportunity for members to

24   appear in connection with that.  I think that there's a

25   presumption to be made that they were aware, that there was a

 1    possibility for a trustee, that there was a conversion, and

 2    that something had to have been done in the course of an

 3    appeal.  And the notice of appeal makes very clear that it was

 4    filed by the corporate debtor.

 5          Again, I don't need Your Honor to make a finding today

 6    or a legal ruling on that.  We simply raise it for the

 7    proposition that we don't believe that there's any substantial

 8    likelihood of success on the merits, and certainly not on the

 9    factual record that's been made.  And then again, on the point

10    we've made here, procedurally whether there's any likelihood of

11    success.

12          I'm not sure where Mr. Carlebach's argument in his

13    papers fall on the Fifth Amendment.  I just don't understand

14    it, and I'll move on to that.

15          Your Honor, I think I've addressed the arguments that

16    Mr. Carlebach raised in connection with the stay pending

17    appeal, but certainly, the rung last is the balance of the

18    harms.  I think the record is clear that there are creditors,

19    there are in this estate, pre-petition creditors, there are

20    holders of Chapter 11 administrative expenses that are readily

21    apparent.  We don't know the extent of the unpaid Chapter 11

22    expenses because the debtor has not yet filed his Chapter 11

23    final report or scheduled unpaid administrative expenses.  But

24    certainly, one could imagine that one of the things the trustee

25    would want to see is a general ledger for the debtor to

1   understand what liabilities are out there so that an

2   appropriate bar date for Chapter 11 administrative creditors,

3   and perhaps pre-petition creditors, ought to be given so that

4   all creditors have an opportunity to be heard in the case.

5          So on the score of balance of harm here, Your Honor,

6   there are unpaid creditors, and there's a debtor who has taken

7   a million dollars, or more, keeping the status quo as the

8   debtor argues for -- the conclusion is the debtor gets to keep

9   the money while creditors go unpaid; that simply can't be

10  correct.  So on the balance of harm, the scales tip decidedly

11  in favor of denial of the motion.

12         That, Your Honor, I think, covers all the bases that

13  we've heard this morning regarding the stay pending appeal.

14  I'm happy to answer any questions.

15         THE COURT:  All right, thank you.

16         Okay, Mr. Carlebach.

17         MR. CARLEBACH:  I think Ms. Cacuci actually answered

18  her own question in terms of why she wasn't paid.  We were

19  given a bill of costs --

20         MS. CACUCI:  Your Honor, it's not me personally, so I

21  would appreciate if he refers to the City, not to me

22  personally.

23         MR. CARLEBACH:  Ms. Cacuci is representative of the

24  City of New York, I did not mean to personalize it.

25         We were given a bill of costs by the title closer,

1  which reflected the lower tax rate.  And I think there was some

2  question about whether or not this was viewed as a residential

3  transaction, which is billed at the lower rate, or whether

4  because it was four apartments it has to be billed at the --

5          MS. CACUCI:  Five.

6          MR. CARLEBACH:  Five apartments billed at the higher

7  rate.  They gave us the lower rate and we paid it.  They may

8  have made a --

9          THE COURT:  You didn't pay it.

10          MS. CACUCI:  Who was "they"?

11          MR. CARLEBACH:  We did pay it.  There's a check that I

12  attached in my papers.

13          THE COURT:  No, you gave a check to the title company,

14  and --

15          MR. CARLEBACH:  And they were -- which they had taken

16  upon themselves to pay; that's what title companies do.  They

17  insist on taking that money, they wouldn't -- they don't allow

18  you -- that's a closing cost, which is permitted under the sale

19  order, and we paid the closing costs.  It's the title of the

20  document they gave us as a closing cost.  They subsequently,

21  apparently, made a decision not to pay it because they decided

22  that they need to do this at the higher rate and they need more

23  money, and they decided not to pay it.  I never got any demand

24  from them saying, you need to give us more money, and --

25          THE COURT:  The debtor never followed up to ensure

1   that the taxes it was obligated to pay were, in fact, paid.

2         MR. CARLEBACH:  I -- Your Honor --

3         THE COURT:  Instead -- excuse me -- instead what

4   happened was the debtor without authority, caused the funds to

5   be removed from the DIP account and now apparently, has created

6   a situation where possibly, there are inadequate funds in the

7   title company's account in order to pay the taxes that are

8   lawfully held.  And in the face of that now, the debtor says,

9   can't return the money, already gave it out.  The entire

10  situation would have been avoided had the Rules and the Code

11  been followed; period.  There is no on the one hand, on the

12  other hand.

13        Those are the facts, it occurred on the debtor's

14  watch, it occurred on your watch, it went unremedied for

15  months.  I don't know where the money is now, and in essence,

16  your argument is everybody should stop making such a fuss and

17  let's be done.  And it's just not the way it works.

18        MR. CARLEBACH:  Two quick points:  Mr. Berger as

19  representing the Chapter 7 trustee suggested that we had been

20  less than candid; Mr. Masumoto suggested that I knew at the

21  time that I got the monies for my fees that there was

22  insufficient money in the account, and --

23        THE COURT:  You knew at the time you got the money for

24  your fees that the debtor had caused the funds to be

25  transferred out of the DIP account without court authority.  As

1   an experience practitioner in this court --

2          MR. CARLEBACH:  I did not know that, Judge, that's

3   just a lie.  Mr. --

4          THE COURT:  I'm lying?

5          MR. CARLEBACH:  Not you, Mr. Masumoto has speculated

6   that at the point that I got the money for my fees I knew that

7   the money had been distributed.

8          THE COURT:  You knew that the money left the --

9          MR. CARLEBACH:  I did not know.

10          THE COURT:  -- DIP account.

11          MR. CARLEBACH:  I did not know that.  I didn't know

12   that until I got the bank statements, which I filed, in

13   response to Mr. Masumoto's dismissal motion.  I asked the

14   debtor, can you give me the bank statements, which was in May

15   of this year, or June.  And then for the first time I saw that

16   the money had left the account.  I was unaware until that

17   point --

18          THE COURT:  Did you promptly run into court to tell me

19   that the money had left the account?  No.

20          In the papers that you filed, you take the position

21   that the distribution was inadvertent.  There's nothing

22   inadvertent about transferring money --

23          MR. CARLEBACH:  It was inadvertent --

24          THE COURT:  -- out of the --

25          MR. CARLEBACH:  -- because the debtor's principal was

1   unaware that he was doing something improper.  Should he have

2   picked up a phone and called me --

3            THE COURT:  Didn't you tell him?

4            MR. CARLEBACH:  -- I wish he would have.

5            THE COURT:  When you sat down at the beginning of the

6   case, here's how it works in Chapter 11:  chapter, verse,

7   chapter, verse.

8            MR. CARLEBACH:  Your Honor, again, he insisted that

9   the monies be put in the DIP account.  I would have expected a

10  call from him.  It is what it is, all I'm saying is that

11  attempts to impugn my integrity are wrong, and should not be

12  the basis --

13           THE COURT:  Well, apparently, attempts to impugn my

14  integrity are perfectly fine, according to you, so let's not

15  talk about impugning integrity.

16           MR. CARLEBACH:  Well, all right, look, all I'm saying

17  is that we have been very forthright.

18           THE COURT:  You have been not forthright in any

19  instance --

20           MR. CARLEBACH:  I -- we have been very forthright,

21  Your Honor, any suggestion that this debtor has made any

22  attempt to subvert the Code intentionally, or the Rules, is

23  plain wrong.  It's just not factual; it's not what happened.

24  Were mistakes made?  Yes.  Can they be fixed?  Yes.

25           I think Mr. Berger saying that he wouldn't entertain a

1   conversation, I would have liked my client to be able to have a

2   conversation with -- sit down with the trustee at any point.  I

3   don't think --

4            THE COURT:  Well, I'll tell you what, we're going to

5   take a break for a few minutes while I consider my ruling on

6   the motion for a stay pending appeal, which is formerly the

7   only thing that's on for today.  You folks can have -- is there

8   something --

9            MR. BERGER:  We actually --

10           MR. TOGUT:  I want to say something, if I may.

11           THE COURT:  I'm sorry, I was trying to move this

12   along; go ahead.

13           MR. TOGUT:  I know.

14           THE COURT:  Go ahead, Mr. --

15           MR. TOGUT:  I don't trust this debtor.  I don't trust

16   anything that we're hearing, and I don't trust it based on

17   everything that happened in the 11.  It is not my normal

18   procedure to subpoena people and get ex parte orders to

19   preserve documents.  I just -- the normal rules, in my view of

20   courtesy and trust were used up during the Chapter 11 case.

21   The well of good will is empty, and I'm doing this by the book.

22           So just for the record, I do not trust this debtor,

23   and I take with a bag of salt what we're hearing from counsel.

24           MR. CARLEBACH:  Your Honor, I make an oral application

25   right now for the disqualification of Mr. Togut based on those

1   outrageous statements.  With no basis he now justified all his

2   fees because he doesn't trust the debtor.  Based on what?  How

3   do you stand up without any record and say I don't trust

4   somebody, and that's why I served a wrath of subpoenas?

5          That's exactly the point in my papers.  There's

6   something fishy about this case.

7          MR. TOGUT:  Yeah, what's fishy is you have a competent

8   trustee who's been doing this for forty years and has seen

9   activity like this before, and there's a pattern.  Okay, you

10  have a debtor here --

11         MR. CARLEBACH:  It's just --

12         MR. TOGUT:  -- who wanted the benefits of Chapter 11,

13  and none of the burdens.

14         MR. CARLEBACH:  Address the Court, Mr. Togut.

15         MR. TOGUT:  One of the burdens that this debtor now

16  has --

17         MR. CARLEBACH:  Don't address me, please address the

18  Court.

19         MR. TOGUT:  -- is to cooperate -- I am addressing the

20  Court.

21         One of the benefits that this debtor has is to

22  cooperate with the trustee.  There hasn't been an ounce of

23  cooperation, there hasn't been an ounce of trying to get to

24  what occurred here, okay.  And so I served subpoenas because I

25  don't want to trust somebody's word.  I've asked for documents

1   so I can see for myself what has happened.  The whole colloquy

2   about the City and the tax claim highlights vividly why we need

3   to see the documents, we need to understand what happened.

4        It's a serious matter that a million dollars was paid

5   without any kind of authority.  It's a serious matter that

6   there was no bar date applied for here.  It's a serious matter

7   that the City of New York got no notice of what occurred here,

8   so I'm not taking on faith anything I'm being told.  I want to

9   see it so that I can verify it.

10        THE COURT:  That's all.  That's all it --

11        MR. TOGUT:  Okay, and I don't want to hear --

12        THE COURT:  -- comes down to.

13        MR. TOGUT:  -- representations from counsel or

14   representations from the debtor; I'm not trusting that.  I want

15   to see the documents, and I want to see exactly what occurred

16   here.

17        THE COURT:  Thank you.

18        MR. TOGUT:  Okay, and if that's a basis for

19   disqualification, that will be the first in the history of the

20   bankruptcy system.

21        THE COURT:  It's not a basis for disqualification.

22   The record has ample bases for the conversion.  Many, many

23   things were not done according to the way they should've been

24   done.  Mr. Togut mentioned the reservoir of good will.

25        In fact -- and it's been ignored -- in fact, the sale

1  order was violated.  The sale order did not provide for the

2  cancellation of the auction.  Any school child knows the

3  difference between the word "postpone" and the word "cancel".

4  Notwithstanding that, I approved the sale.  There are other

5  judges in this building who wouldn't have done that; who

6  wouldn't have done that.  So there's no evidence that a benefit

7  of the doubt was not afforded to this debtor.

8          I think it's unfortunate, in fact, I regret that it

9  was because it seems to have engendered then, a pattern that

10 has led us to where we are today.

11         So with respect to there was an objection filed to the

12 ex parte motion of the trustee for injunctive relief.  I

13 entered the order, I think it's -- there's nothing really on

14 with respect to that, is there, Mr. Berger?

15         MR. BERGER:  No, Judge, there's nothing on to that.

16 The objection touched two points:  first, as to the ex parte,

17 the procedure --

18         THE COURT:  Right, we've talked about that.

19         MR. BERGER:  -- we've addressed that --

20         THE COURT:  Right.

21         MR. BERGER:  But what also is on Your Honor's calendar

22 this morning is the trustee's request that you schedule a final

23 hearing on the injunctive relief, continuing the obligation of

24 parties to preserve subject to alternative obligations.

25         THE COURT:  All right, well, I suppose on that one,

1    and then I do want to take a break and I'll tell you what I'd

2    like to happen during the break, Mr. Carlebach, are you going

3    to consent to the continuation of the injunction, or shall we

4    schedule a hearing?

5              MR. CARLEBACH:  The injunction of preservation, I

6    consent to.

7              THE COURT:  Just --

8              MR. BERGER:  Your Honor, if he consents to that as --

9              THE COURT:  On behalf --

10             MR. BERGER:  -- up at --

11             THE COURT:  -- of all entities and individuals as to

12   whom the injunction applies?

13             MR. CARLEBACH:  I only represent the debtor.  I can

14   only -- I don't have the authority --

15             THE COURT:  Okay, that was my question.  So then we're

16   going to have to have a hearing.

17             MR. BERGER:  We would need a hearing within fourteen

18   days.

19             THE COURT:  Okay.

20             MR. BERGER:  As I look at my calendar, we are looking

21   at a number of federal holidays --

22             THE COURT:  Okay.

23             MR. BERGER:  -- and religious observance holidays.

24             THE COURT:  Right.

25             MR. BERGER:  And pardon me, Your Honor.

1             THE COURT:  So the thirteen days runs --

2             MR. BERGER:  On the 13th is the last day --

3             THE COURT:  Yeah.

4             MR. BERGER:  -- which is currently our date --

5             THE COURT:  Right, so the high holiday is the 12th.

6             MR. CARLEBACH:  The 12th is Yom Kippur.

7             THE COURT:  The 12th is Yom Kippur.

8             MS. CARLEBACH:  Right.

9             MR. BERGER:  How about the 13th?

10            THE COURT:  The 13th.

11            MR. BERGER:  Sure, well --

12            MR. CARLEBACH:  I could do it in the afternoon, Judge.

13            THE COURT:  Yeah, the afternoon on the 13th.

14            MR. BERGER:  Very good, Your Honor.

15            THE COURT:  Okay, 2 o'clock.

16            MR. BERGER:  I will submit an order --

17            THE COURT:  Okay.

18            MR. BERGER:  -- to that affect, Your Honor.

19            THE COURT:  All right.  Okay, so that takes care of

20   that one.

21            MR. BERGER:  Yeah, there was also, you mentioned

22   the --

23            THE COURT:  Contempt.

24            MR. BERGER:  Yes, you did mention that, as well.

25   There was also an objection to my firm's retention.  The

199 EAST 7TH STREET, LLC.                                    62

1   objection was untimely, Your Honor, already entered an order.

2   I think the objection is moot, but I personally filed a

3   declaration, and what Mr. Carlebach is concerned about is my

4   disclosure on behalf of the firm that last January I was

5   contacted by a person whose name I can't even recall

6   representing that she was a member of the co-op board, and that

7   they had a claim against this debtor.

8        I can tell Your Honor, as I did in my declaration,

9   that that call lasted maybe five minutes.  Once I learned the

10  amount of the claim, what the case was about, we declined the

11  representation.  I never met with anyone from the co-op board,

12  I never received any documents; I received absolutely no

13  compensation in connection with that, and that was the

14  beginning and end of my interaction with the case and that

15  party.  And that party, the co-op board, has been paid in full

16  pursuant to Your Honor's final sale order.  As we stand here

17  today, the trustee doesn't have any adverse claim against the

18  co-op board.

19       We have asked them for documents, and they will

20  produce them, but it is certainly not in any way a

21  disqualifying interest.  We don't represent an interest adverse

22  to the estate, and I think it was more, as we always do,

23  disclose to err on the side of caution, and that's why we

24  disclosed it.  It certainly is not any form of disabling

25  conflict.

1          THE COURT:  All right, Mr. Masumoto, does your office

2     have a view about that?

3          MR. MASUMOTO:  Yes, Your Honor.  In fact, before

4     appointing counsel, we discussed -- we asked them to do a

5     conflict check.  The disclosure was made to us, we evaluated

6     that, and determined that it was not a disabling conflict,

7     also.  We did request, and unnecessarily perhaps, but we did

8     request to make sure that it was included as a disclosure in

9     the retention application.

10          THE COURT:  All right, well, the retention order

11     stands.  We have a date for the next hearing on the preliminary

12     injunction.

13          What I'd like to do is take a break for about seven to

14     ten minutes, and I'd like you to have a discussion about next

15     steps.  Meaning, when is the money coming back, when are the

16     documents being produced, shall we enter an order to show cause

17     requiring the principal of the debtor to appear at the next

18     hearing or sometime before, or at some time and a place where

19     the trustee and his counsel can discuss the open issues.

20          Again, we want to avoid the proliferation of expenses,

21     and get to the facts as quickly as possible, and that's what

22     this is all about.  So I will come back in about ten minutes

23     and --

24          Mr. Carlebach, it's a little unsettling to be sitting

25     up here and have people just looking at their phones.

1          MR. CARLEBACH:  I'm sorry.

2          THE COURT:  Thank you.

3          So why don't I leave it to you folks to have a

4   conversation?  I think the U.S. Trustee ought to remain

5   involved, of course, and we'll come back out in about ten

6   minutes.

7       (Recess from 11:34 a.m. until 11:47 a.m.)

8          THE COURT:  All right.

9          MR. TOGUT:  We couldn't have the conversation; he

10  disappeared.

11         MR. MASUMOTO:  Your Honor, let me see if I can locate

12  him.

13         THE COURT:  Well, a number of our people from the

14  Court were on or near the train, but none hurt, so --

15         MR. MASUMOTO:  Good.

16         MS. CACUCI:  It hit the building?

17         THE COURT:  It looks like it didn't stop and it

18  literally went into --

19         MR. VELEZ-RIVERA:  Yeah, it kept on going.  I saw the

20  photos before court --

21         THE COURT:  Yeah.

22         MR. VELEZ-RIVERA:  -- and I pass through there every

23  day.

24         THE COURT:  Yeah.

25         MR. VELEZ-RIVERA:  I don't know what happened, but it

1  clearly went --

2          THE COURT:  No one does.

3          MR. VELEZ-RIVERA:  -- right through the -- there's

4  some protectors to --

5          THE COURT:  Sure.

6          MR. VELEZ-RIVERA:  -- push the train back --

7          THE COURT:  Right.

8          MR. VELEZ-RIVERA:  -- in case that happens --

9          THE COURT:  But at that point --

10         MR. VELEZ-RIVERA:  -- but it breached --

11         THE COURT:  -- it should be going so slowly --

12         MR. VELEZ-RIVERA:  They're going like at less than

13  one --

14         THE COURT:  Yeah.

15         MR. VELEZ-RIVERA:  -- so one assumes that the brakes

16  failed or just human error or something like that.  I have no

17  idea.

18         THE COURT:  Well, I was on the train that was stopped

19  on the Google Map this close to where they found the bomb in

20  Elizabeth.  I was coming home from Philadelphia that night.

21  Bottom line is, I got home at 2:30 in the morning after we sat

22  on the tracks, got abandoned by the crew, had no information.

23  When they finally backed us up to the point where they could

24  let us out in Rahway, they opened the car doors and they said

25  you're free to leave, good luck, folks.  So everyone, packed

1   train, a woman with a a baby was in our car, finally I was able

2   to get -- we were able to get an Uber driver to come, but it

3   was really -- it was frightening.

4           MR. VELEZ-RIVERA:  Yeah.

5           MR. TOGUT:  Yeah, yeah.

6           Well, what do we do?

7           THE COURT:  Well, I'm going to start reading a

8   decision in about five minutes that I'm going to make you sit

9   through, but I have to get going, I'm giving a talk this

10  afternoon.

11          MR. TOGUT:  Can we get help from the marshal's office?

12          THE COURT:  Would you go out and take a look and see

13  if you can find Mr. Carlebach?

14          THE COURT OFFICER:  Sure.

15          THE COURT:  Thank you.

16      (Recess from 11:49 a.m. until 11:50 a.m.)

17          THE COURT:  Rather than simply enter an order for the

18  benefit of any court that subsequently is asked to entertain a

19  motion for a say pending appeal, I always find that it's useful

20  to provide this Court's recitation of the predicate facts and

21  view of the arguments.  So this will take a few minutes, but it

22  won't be terribly long, and that way I will so order the

23  record, and the transcript will serve as this Court's order so

24  that nobody else has to do any additional work.

25          Before the Court is the motion of 199 East 7th Street,

1    LLC, or the debtor, by and through its attorneys, the law

2    offices of David Carlebach, Esq., for a stay pending appeal of

3    this Court's order converting the debtor's Chapter 11 case to a

4    case under Chapter 7 and ordering the return of distributed

5    funds to the debtor's estate by the close of business on

6    September 21st, 2016, docket number 63 as amended by docket

7    number 66, hereinafter, the conversion order.

8           By way of background, on November 26th, 2014, the

9    petition date, the debtor filed a voluntary petition for relief

10   under Chapter 11 of the Bankruptcy Code.  On the petition date,

11   the debtor was the owner of shares in a housing cooperative

12   corporation known as East 7th Street Development Corp. and the

13   lessee under proprietary leases for apartment units represented

14   by the shares.  No official committee of unsecured creditors

15   was appointed in the debtor's bankruptcy case.

16          On January 21st of 2015, the Court approved the

17   debtor's application to retain the law offices of David

18   Carlebach as counsel to the debtor, docket number 14.  As of

19   the date of this decision, Mr. Carlebach has filed no

20   application with this Court seeking approval pursuant to

21   Sections 330 and 331 of the Bankruptcy Code of compensation of

22   fees and reimbursement of expenses incurred during the debtor's

23   case.

24          On March 18th, 2015, the debtor filed an application

25   at docket number 21, the sale motion, for an order authorizing,

1    among other things, the sale of the shares and the assignment

2    of the proprietary leases to ThM Funding for one million

3    dollars, subject to higher and better offers.

4            After notice and hearing, this Court entered an order

5    which, among other things, one, approved bidding procedures;

6    two, scheduled an auction to be conducted on June 18th, 2015;

7    and three, scheduled a hearing to be conducted on July 9th,

8    2015, to consider the sale of the shares and the assumption and

9    the assignment of the proprietary leases.  That's at docket

10   number 24, hereinafter the bidding procedures order.

11           Paragraph 5 of the bidding procedures order provided

12   that "except as may be limited by the contract of sale, the

13   debtor is authorized to extend the deadlines set forth in the

14   order and/or adjourn, continue, or suspend the auction, and/or

15   the sale hearing, for any reason without further order of this

16   Court by filing a notice with this Court and serving such

17   notice on all notice parties and potential bidders."

18           On June 17th, 2015, the debtor filed a notice of

19   presentment of auction sale, stating that the auction would be

20   postponed for a period of one week.  On June 29th, 2015, the

21   debtor filed a notice of adjournment of sale and confirmation

22   hearing stating that the sale would be adjourned until July

23   21st, 2015.  On July 16th, 2015, the debtors filed a notice of

24   cancellation of auction sale, stating that the auction

25   originally scheduled for June 18th has been cancelled by the

1   debtor in accordance with paragraph number 5 of the bid

2   procedures order.

3           On July 17th, 2015, the debtor filed a declaration of

4   David Carlebach in support of confirmation of sale seeking

5   approval of an undated contract of sale of the shares and the

6   proprietary leases to Moses Strulovitch and his assignees for

7   1.65 million dollars.

8           At the hearing on the sale motion held on July 21st,

9   2015, at which the debtor's unilateral cancellation of the

10  auction and noncompliance with the bidding procedures orders

11  was discussed, Mr. Carlebach stated on the record that "he

12  understood Your Honor's point about me having violated the

13  order on the bid" and offered to file a new sale motion.  After

14  further discussion on the record of the hearing, the Court

15  nevertheless, approved the sale.

16          On September 30th, 2015, the Court entered its order

17  approving the sale of the shares and the assignment of the

18  proprietary leases to Mr. Strulovitch for 1.65 million dollars.

19  The sale order authorized the debtor to pay the following from

20  the proceeds of the sale:  customary closing costs and

21  applicable transfer taxes, a breakup fee to ThM of 60,000

22  dollars, a backup bidder deposit to ThM of 100,000 dollars, and

23  a cure amount to the cooperative corporation of 250,000

24  dollars.  The sale order did not authorize the debtor to make

25  any other payments.

1          While the Court has since been informed that the sale

2     closed, the debtor did not file a notice of completion of the

3     sale in compliance with Bankruptcy Rule 6004(f)(1).

4          After the debtor failed to file any monthly operating

5     reports subsequent to July 2015 and failed to file a plan and

6     disclosure statement, the United States Trustee filed a motion

7     to dismiss or convert the debtor's case to Chapter 7, dated May

8     10th, 2016, at docket number 51.  No response to the conversion

9     motion was timely filed, and Mr. Carlebach did not appear at

10    the June 28th hearing on the conversion motion.

11         On the record of the June 28th, 2016, hearing, the

12    Court rescheduled the hearing on the conversion motion in

13    response to requests by Mr. Carlebach, directed that the debtor

14    become current on its monthly operating reports prior to the

15    adjourned hearing date, and set a deadline of July 13th, 2016,

16    for the filing of any response by the debtor to the conversion

17    motion, which response deadline was subsequently extended to

18    October 1st, 2016.

19         On August 4th, 2016, the U.S. Trustee filed the

20    supplemental declaration recommending conversion of the

21    debtor's case to Chapter 7.  The supplemental declaration

22    listed certain claims set forth on the debtor's schedules,

23    which claims included unsecured claims, and it stated that

24    according to the debtor's July 2015 operating report, unpaid

25    professional fees totaled 35,000 dollars.

1      The debtor did not file its response to the conversion

2  motion until August 8, 2016, the date of the rescheduled

3  hearing on the conversion motion.

4      At the August 8th hearing, Mr. Carlebach, for the

5  first time, informed the Court that after the sale closed he

6  had transferred the proceeds of the sale to the debtor's DIP

7  account rather than to counsel's account, after which the

8  debtor "took the money and disbursed those funds to its equity

9  holders who included family members of the debtor's managing

10  member, James Guarino."

11      Mr. Masumoto, on behalf of the United States Trustee,

12  indicated on the record of the hearing that counsel to the City

13  of New York had confirmed that transfer taxes due upon the sale

14  of the shares had not been paid.  In addition, Mr. Carlebach

15  advised the Court that he was holding 30,000 dollars of the

16  sale proceeds for his legal fees.

17      After considering the conversion motion, the

18  supplemental declaration, the response, and the full record of

19  this case, including the August 8th, 2016, hearing, the Court

20  directed that all monies disbursed by the debtor be returned to

21  the debtor's DIP account, together with a detailed accounting,

22  and the case be converted to Chapter 7 in order for an

23  independent fiduciary to figure out what had transpired with

24  respect to the sale proceedings and whether or not there were

25  other creditors who needed to be paid before the debtor's

1   equity holders were entitled to receive proceeds from the sale.

2          The Court also noted that the debtor had failed to

3   comply with the Court's directive to become current on its

4   monthly operating report by August 8th, had failed to file its

5   response by the August 1st deadline set by the Court, and had

6   failed to follow other orders in this case, such as the sale

7   order.

8          A conversion order was entered as amended on September

9   8th, 2016.  By the conversion order, the Court converted the

10  debtor's Chapter 11 case to a case under Chapter 7 and directed

11  that "all funds belonging to the debtor as of October 29th,

12  2015, that were disbursed without Court approval shall be

13  returned to the Chapter 7 trustee no later than the close of

14  business on September 21st, 2016."  On September 14th, 2016,

15  the United States Trustee appointed Albert Togut as the Chapter

16  7 trustee in the debtor's case.  The Chapter 7 trustee has

17  informed the Court that as of the date hereof, the debtor has

18  failed to return any funds to the trustee in violation of the

19  conversion order.

20         On September 19th, 2016, the debtor filed a notice of

21  appeal of the conversion order.  On September 21st, 2016, the

22  debtor filed the instant motion for a stay pending its appeal

23  of the conversion order; the stay motion.  Objections to the

24  stay motion were filed by the United States Trustee and the

25  Chapter 7 trustee, and a letter regarding the stay motion was

 1    filed by the City of New York.

 2              On September 22nd, 2016, the trustee filed an ex parte

 3    application for an order directing preservation of documents

 4    and recorded information and authorizing the issuance of

 5    subpoenas pursuant to Bankruptcy Rule 2004.  The Court entered

 6    a scheduling order on the Rule 2004 motion granting provisional

 7    injunctive relief and scheduling a hearing on the Rule 2004

 8    motion.  That hearing was held today, as was a hearing on the

 9    stay motion.  This decision will address the stay motion.

10              By the stay motion, the debtor argues that each of the

11    four factors considered by courts in determining whether a stay

12    pending appeal is warranted favors staying the conversion

13    order.  The Chapter 7 trustee and the U.S. Trustee vehemently

14    disagree.  The Court will discuss each of the factors in turn.

15              One, applicable law on the stay pending appeal.

16    Federal Rule Bankruptcy Procedure 8007(a)(1) provides that

17    ordinarily, a party must move first in the Bankruptcy Court for

18    the following relief:  a stay of a judgment, order, or decree

19    of the Bankruptcy Court pending appeal; the approval of the

20    supersedeas bond; an order suspending, modifying, restoring, or

21    granting an injunction while an appeal is pending; or the

22    suspension or continuation of proceedings in a case or other

23    relief permitted by subdivision (e).

24              The decision as to whether or not to grant a stay of

25    an order pending appeal lies within the sound discretion of the

1   Court; see e.g., General Motors, 409 B.R. 30, In re: New York

2   Skyline, 520 B.R. 1, 5 (S.D.N.Y. 2014).

3          As the District Court held in ACC Bondholder Group v.

4   Adelphia Communications Corp., In re: Adelphia Communications,

5   361 B.R. 337, 346 (S.D.N.Y. 2007), the Court must consider four

6   factors in exercising this discretion:  one, whether the movant

7   will suffer irreparable injury acts in the stay; two, whether a

8   party will suffer substantial injury if a stay is issued;

9   three, whether the movant has demonstrated a substantial

10  possibility, although less than a likelihood of success on

11  appeal; and four, the public interest that may be affected.

12  See also, Sabine Oil & Gas Corporation, 548 B.R. 674 (S.D.N.Y.

13  2016).

14         This Court has stated the burden on the movant seeking

15  the extraordinary relief of a stay is a heavy one.  In re:

16  Sabine Oil & Gas, 551 B.R. 132, 142 (Bankr. S.D.N.Y. 2016),

17  quoting General Motors, 409 B.R. at 30.

18         While certain courts in this circuit have held that to

19  prevail, the moving party must show satisfactory evidence on

20  all four criteria, other courts in this circuit have held that

21  the inquiry involves a balancing of the four factors, and the

22  lack of any one factor is not dispositive to the success of the

23  motion.

24         Two, discussion of the four-factor test for stay

25  pending appeal.  In accordance with this Court's prior

1   discussions and rulings on motions for stay pending appeal, the

2   Court declines to make a definitive determination as to whether

3   the movant here is required to satisfy all four factors of the

4   four-part test in order to succeed on its motion for a stay

5   pending appeal.  Instead, the Court will employ the balancing

6   approach utilized General Motors and in other recent cases.

7           The Court finds that it would reach the same

8   conclusion that the debtors request for a stay must be denied,

9   regardless of whether in the instant case the Court applies the

10  rigid test requiring compliance with all four factors, or the

11  more generous balancing approach.  The Court will discuss each

12  of the factors in turn.

13          A, irreparable injury.  A showing of probable

14  irreparable injury is the principal requisite for the issuance

15  of a stay pursuant to Bankruptcy Rule 8007, and such harm must

16  neither be remote nor speculative, but actual and imminent.

17  See Sabine, 548 B.R. at 681, citing Adelphia 361 B.R. at 347,

18  citations omitted.

19          The moving party must demonstrate that such injury is

20  likely before the other requirements will be considered.  In

21  re: Perry H. Koplik & Sons, Inc., 2007 Westlaw 781905 at *1,

22  Bankruptcy S.D.N.Y., March 13th, 2007.  The debtor argues that

23  it will suffer irreparable harm because it will be subject to a

24  whole layer of administrative costs by a trustee and

25  "oppressive litigation by a trustee", including contempt

1   proceedings and 542 motions seeking the return of funds to the
2   estate; funds which will then have to be redistributed to those
3   same parties.

4           The Court finds that these assertions fail to provide
5   any basis for a finding that if the conversion order is not
6   stayed, the debtor will suffer actual irreparable harm.  The
7   Court directed, both on the record of the hearing held on
8   August 8th, 2016 and by the conversion order, that all estate
9   funds distributed by the debtor without court approval be
10  returned to the trustee by September 21st, 2016.  The debtor
11  has failed to comply.

12          Any harm to the debtor occasioned by the fact that the
13  trustee may now need to expend professional fees to seek the
14  return of such funds is, as the U.S. Trustee argues, self-
15  inflicted, as the debtor's noncompliance is directly correlated
16  to the amount of trustee and professional fees that may be
17  incurred.

18          As the trustee points out, if the debtor cooperates in
19  figuring out what happened with the sale proceeds, the costs
20  will be significantly lower than if the debtor contests the
21  trustee's actions.  In the words of the trustee, the debtor
22  itself is in control of the Chapter 7 costs and will only have
23  itself to blame if the costs spiral upward.  The debtor has not
24  demonstrated that it will suffer any irreparable harm absent a
25  stay.

1          B, potential harm to other parties.  With respect to

2     the second prong for the test for a stay pending appeal, the

3     movant must establish that the nonmoving party or other parties

4     will not suffer substantial harm if the stay is granted.  In

5     other words, the moving party must show that the balance of

6     harm tips in favor of granting the stay.  See Sabine, 548 B.R.

7     at 682, citing Adelphia, 361 B.R. at 349, citations omitted.

8          While debtor argues that there are no remaining

9     unsecured creditors in the case, the Court has been provided

10    with no evidence to support this assertion.  Nothing on the

11    docket of the case indicates when or how the claims of

12    unsecured creditors Komar and Gottlieb were resolved as the

13    debtor asserts, who resolved them, or where the funds came from

14    to pay such claims.  There are also two other unsecured claims

15    listed on the debtor's schedule F, the disposition of which is

16    unknown.

17         Moreover, the debtor has not presented any information

18    indicating that all administrative claims from the Chapter 11

19    case have been paid, the largest of which appears to be

20    transfer taxes due and owing to the City and State of New York

21    from the sale of the shares and the proprietary leases.  The

22    debtor has put forth no evidence to controvert the United

23    States Trustee's allegations of the nonpayment of such transfer

24    fee taxes.  Finally, the U.S. Trustee has asserted that the

25    debtor owes statutory United States Trustee fees pursuant to 28

1   U.S.C. Section 1930(a)(6) in the amount of at least 6,175

2   dollars, and possibly interest thereon, which amounts cannot be

3   calculated precisely until the debtor files the ten monthly

4   operating reports that remain past due.

5          Any stay of the conversion order would further delay

6   the immediate return of the unlawfully distributed estate

7   funds, and once the Chapter 7 trustee has completed his

8   investigation, the distribution by the trustee of such funds to

9   any of the aforementioned claimants that remain unpaid.  As the

10  trustee correctly points out, he will be unable to perform his

11  fiduciary obligations if his administration of the case is

12  stayed.  Accordingly, the Court finds that the debtor has

13  failed to establish that other parties will not suffer

14  substantial harm if the stay is granted.

15         C, substantial possibility of success on appeal.  The

16  substantial possibility of success on appeal test is considered

17  an intermediate level between possible and probable and is

18  intended to eliminate frivolous appeals.  See Sabine 548 B.R.

19  at 683, 684, citing In re: 473 West End Realty Corp., 507 B.R.

20  496, 501, citations omitted.

21         The probability of success that must be demonstrated

22  is inversely proportional to the amount of irreparable injury

23  that the plaintiff will suffer absent the stay.  In other

24  words, more of one excuses less of the other.  The trustee

25  submits that the debtor lacks standing to pursue its appeal of

1   the conversion order, leaving aside the fact that the debtor
2   has not demonstrated a substantial possibility of success on
3   appeal.  The Court is inclined to agree.  When a Chapter 7
4   trustee is appointed, a corporate debtor no longer has standing
5   through appeal.  See e.g., In re:  C.W. Mining Company, 636
6   F.3d 1257, 1265 (10th Cir. 2011); South Edge, LLC v. JPMorgan
7   Chase Bank, 2011 Westlaw 1626567, District of Nevada, April
8   28th, 2011.

9           Even assuming arguendo, that a corporate debtor does
10  have standing to appeal the entry of the conversion order, the
11  debtor has failed to demonstrate a substantial possibility of
12  success on appeal, instead, only making accusations in the same
13  motion which the Court declines to address here.

14          The Court's decision to convert this case was based
15  upon the entirety of the record before it, including but not
16  limited to:  one, the debtor's failure to file documents
17  required by the Bankruptcy Rules and the Bankruptcy Code,
18  including monthly operating reports, a notice of sale pursuant
19  to Bankruptcy Rule 6004(f)(1), and the Chapter 11 plan and
20  disclosure statement; two, the debtor's failure to comply with
21  the Court's directive at the June 28th hearing to become
22  current with monthly operating reports prior to the August 8th,
23  2016, hearing; three, the lack of information provided by the
24  debtor regarding its administration of its Chapter 11 case,
25  including information concerning the distribution of the

1    proceeds from the sale of the shares and the proprietary leases

2    since, according to the counsel's statement on the record of

3    the August 8th, 2016, hearing, the debtor "took the money" and

4    distributed it to its equity holders, including its managing

5    member and his family members; and four, the debtor's counsel

6    admission that the debtor took the net proceeds of the sale and

7    distributed them without seeking Court approval.

8           The Court ruled that these failures by the debtor to

9    administer its case properly, necessitated the appointment of a

10   Chapter 7 trustee as an independent fiduciary to examine what

11   occurred during the Chapter 11 case and to receive the

12   distributed funds and to correct any missteps in distribution.

13   The Court finds no substantial possibility of success on appeal

14   of the conversion order.

15          Finally, D, the public interest.  The debtor argues

16   that public policy favors a stay "to ensure the availability of

17   meaningful relief for the debtor and a correct outcome of the

18   issues on appeal", since maintaining the status quo until the

19   debtor's appeal is heard will help ensure that issues do not

20   become moot by "an unnecessary transfer of funds and any

21   implications that may result from a transfer of funds".  This

22   statement is cryptic to the extent that the debtor is referring

23   to a transfer of funds other than back into a trust account of

24   the Chapter 7 trustee; the Court disagrees.

25          Courts have held that "the public interest" in the

1    expeditious administration of bankruptcy cases, as well as in

2    the preservation of a debtor's assets for the purpose of paying

3    creditors rather than the litigation of claims lacking

4    substantial possibility of success, outweighs the public

5    interest in resolving the issues presented on appeal.  See In

6    re: Metiom, Inc., 318 B.R. 263, 272 (S.D.N.Y. 2004).  Se also,

7    In re: Taub, 2010 Westlaw 3911360 at *6 (Bankr. E.D.N.Y.,

8    October 1st, 2010).

9            As argued by the United States Trustee, the public

10   interest weighs in favor of the responsible administration of

11   the debtor's case which, here, necessitates an examination of

12   the events that transpired during the debtor's time in Chapter

13   11 and a recovery of the estate's funds immediately in order to

14   ensure that all creditors are paid.  The public interest

15   mandates against the grant of a stay pending appeal here.

16           Finally, it bears noting that the public interest

17   unquestionably requires adherence to the rule of law, which in

18   this case means compliance with the Bankruptcy Code, the

19   Bankruptcy Rules, and the orders of this Court.  A debtor and

20   its counsel are not entitled to pick and choose which

21   provisions of the Code or court orders will be followed.

22   Having sought protection in Chapter 11, it was incumbent upon

23   this debtor and its counsel to act in accordance with the

24   statutory framework.

25           Unfortunately, the debtor's counsel has taken the

1   view, repeatedly, and in unsavory inflammatory language in

2   various pleadings, that this Court has "unbridled hostility,

3   ill will, and white-hot wrath", and is motivated by "pure

4   vindictiveness" to enforce its orders and ensure the integrity

5   of the bankruptcy process.

6           Not content to stop with levelling such unfounded

7   accusations against the Court, counsel takes aim at the Chapter

8   7 trustee, the United States Trustee, whom it accuses of

9   perjury, and in a filing in the middle of the night last night,

10  at counsel for the City of New York who simply seeks to ensure

11  that transfer taxes due the City are paid.

12          Putting all that aside, and without dignifying any of

13  counsel's myriad unfounded statements, it bears emphasis that

14  it all comes down to the simple issue of compliance with the

15  requirements of administering a Chapter 11 case in accordance

16  with the Bankruptcy Code, the Bankruptcy Rules, and the orders

17  of the Court; no more, but no less.  The public interest is

18  decidedly on the side of the integrity of the bankruptcy

19  process.  Denial of the stay will ensure that the status quo

20  remains in place while an independent fiduciary, and if

21  necessary, a review in Court, reviews all the issues herein.

22          It is so ordered.  After considering all the factors

23  and attests for granting a stay pending appeal, for all the

24  foregoing reasons and in the exercise of its discretion

25  pursuant to Bankruptcy Rule 8007, the Court hereby denies the

1    stay motion.

2          Okay, so you can get a transcript, it can be filed on

3    the docket, and that can serve as the basis for anything

4    further for which it is needed.

5          So that's all I have.  I would like to talk about, for

6    a moment, what happens next since I have an order currently

7    unstayed and no monies that have been returned.  So I'm open to

8    suggestions.

9          MR. TOGUT:  Well, Your Honor, despite Mr. Carlebach's

10   conclusion about how I'm going about my job here, I very much

11   share the Court's desire to get to the heart of the problem,

12   figure out exactly what the situation is with claims that need

13   to be paid, and how to resolve the case; that's my interest.

14   The best way to get there is for the debtor, and Mr. Carlebach,

15   and others involved in this to cooperate.

16         One thing we've learned over the years is litigation

17   is the least efficient and the most expensive way to get

18   anything done.  The --

19         THE COURT:  Well, first of all, I've so ordered the

20   record, but I think just for crispness, I need a one-line order

21   that says for the reasons stated on the record.

22         MR. TOGUT:  Okay, sure.

23         THE COURT:  Okay, so it's the U.S. Trustee's motion,

24   so Mr. Masumoto, could you take care of that?

25         MR. MASUMOTO:  Yes, Your Honor --

1           THE COURT:  Okay.

2           MR. MASUMOTO:  -- I will prepare an order.

3           THE COURT:  But I have a contempt; there is an ongoing

4    contempt, so what do you want to do?

5           MR. TOGUT:  Okay, so there's two things we could do.

6    We could move to hold the people who are defying the order in

7    contempt formally so that the district court can then act on

8    that --

9           THE COURT:  I can act on that.

10          MR. TOGUT:  And I -- well, it depends on what the

11   remedy is.  I've been down this road, too.

12          THE COURT:  Okay.

13          MR. TOGUT:  Okay.

14          THE COURT:  But, I mean, I can -- I believe I can

15   impose monetary sanctions -- I can impose coercive sanctions;

16   not punitive, but coercive.

17          MR. TOGUT:  Well, just --

18          THE COURT:  But I want to get -- I want the shortest

19   distance between two points.

20          MR. TOGUT:  Yeah, me, too, by the way.

21          THE COURT:  Okay.

22          MR. TOGUT:  The whole -- I mean, just so debtor's

23   counsel can understand, the whole point of what I have done

24   thus far in seeking to preserve records, in seeking turnover

25   records, was to do this expeditiously; that was the whole

 1   point.

 2         THE COURT:  Okay, I just want to -- I have to state

 3   that by not pursuing contempt, I am not reflecting this Court's

 4   view in any way that it's okay with me that my order has not

 5   been complied with.  And as we're sitting here, we do not know

 6   where the money is.  All we know is that there's a statement

 7   filed on the docket that says the return of the money is

 8   impossible.

 9         So I'm not looking to proliferate and magnify things,

10   but it's important for me to say on the record that there's an

11   order; it hasn't been complied with.  It's not okay with me

12   that it hasn't been complied with, and we're just going to have

13   to see what happens next.  I believe I have the power to impose

14   sanctions on my own or pursuant to somebody's request.  It's

15   not my favorite thing to do, so that's it.  I will --

16         MR. TOGUT:  Okay, and let me -- because you know I'm a

17   very practical --

18         THE COURT:  And I'm very --

19         MR. TOGUT:  -- trustee.

20         THE COURT:  -- practical, too.

21         MR. TOGUT:  So I'm going to take Mr. Carlebach's

22   position for a minute.  If I get cooperation, and I'm able to

23   do the investigation I need to do, and I find out that, indeed,

24   almost all the creditors have been paid in full, and so the

25   result would be, as he advocates, money would go back to the

1   equity; that's what would happen, right.  So if we're going to

2   go down the road of moving for contempt and all that, and it

3   turns out at the end of that process that the money would go

4   back to equity, it's going to be hard to find contempt.  So

5   what I would like to do is get some cooperation, find out if,

6   in fact, what Mr. Carlebach is telling the Court is true --

7           THE COURT:  Well, we look like -- on its face we have

8   a shortfall.  We don't have -- it seems to me that we need to

9   find out what the correct amount of transfer taxes is.

10          MS. CACUCI:  I'll find out what the --

11          THE COURT:  Right, so --

12          MS. CACUCI:  -- they may very well be treated as

13  commercial since it's --

14          THE COURT:  Whatever.

15          MS. CACUCI:  -- they're in bulk.

16          THE COURT:  I don't have a view --

17          MS. CACUCI:  Yeah, I'll find out.

18          THE COURT:  -- to Mr. Togut's point, which is picking

19  up --

20          MS. CACUCI:  But regardless, it was not paid.

21          THE COURT:  They haven't been paid, there are two

22  facts:  they haven't been paid, the U.S. Trustee hasn't been

23  paid, and there's no money.

24          MR. TOGUT:  Well, there's no money until there's

25  money.  If it turns out that we're looking at a world of

1  100,000 dollars, there may be money.  I mean, I don't know,

2  okay.

3          THE COURT:  I don't, either.

4          MR. TOGUT:  One thing that troubles me a lot here, and

5  I think it troubles the U.S. Trustee, is there was no bar date.

6  So we're relying on what the debtor told us is the world of

7  claims; we don't know.

8          MS. CACUCI:  No, there was a bar date.  There

9  was -- not admin --

10          MR. TOGUT:  I'm sorry, no admin date.

11          MS. CACUCI:  No admin bar date.

12          MR. TOGUT:  No admin bar date.  So we've got to nail

13  down what the claims are, we have to nail down to what extent

14  they're not paid, and we have to also find out if the money

15  will come back to cover all this stuff.  If it turns out that

16  the debtor continues to act as it has, and says I'm not paying

17  anything back, then you're right, we have to go to contempt;

18  that's the only alternative.  But if --

19          THE COURT:  Well, first of all, we seem to have an

20  issue of we don't know where the debtor is.

21          MR. TOGUT:  Yeah, that, too.

22          MR. CARLEBACH:  Well, the debtor is not hiding.  I

23  just spoke to the debtor on the phone; he told me he's out of

24  town.

25          I don't know about this issue with the -- I'm hearing

1  for the first time about an issue in service.  I think it's a

2  leap to say we don't know where the debtor is just because

3  somebody couldn't effectuate service.  So again, and it's the

4  first time I've heard about this issue.  My client hasn't run

5  anywhere; he isn't running away.  I thought based on

6  communications I had with him he was going to be here today;

7  apparently, he's out of town.  Maybe I miscommunicated, but I

8  would've insisted he be here had I realized that he wasn't

9  planning on attending, but the point being that --

10        THE COURT:  How could he not plan to attend?  There's

11  a hearing on the motion to stay an order that requires him to

12  turn over funds.  How could he have made a determination to not

13  attend?

14        MR. CARLEBACH:  Your Honor, I cannot answer.  I

15  thought he would be here.  And it is what it is.  I don't

16  know --

17        THE COURT:  What's his address?

18        MR. CARLEBACH:  Again, I am not aware.  I've

19  been -- hear it for the first time that the debtor's address is

20  not what it historically was.  I will inquire as to what his

21  new address is; it's the first time I've heard of it.  And

22  again, somebody couldn't -- the process server couldn't serve

23  something; I'm just taking whatever trustee's counsel --

24        THE COURT:  Cooperation would look like you're saying

25  affirmatively that you'll accept service on behalf of the

1   debtor.  That's what cooperation would look like.

2           MR. CARLEBACH:  I accept service on behalf of the

3   debtor.  That --

4           THE COURT:  Excellent.

5           MR. CARLEBACH:  That's not an issue.  I still -- I'm

6   not sure if I'm hearing something different from the trustee.

7   I think it would be constructive to have a sit-down with

8   myself, my client, and the trustee, sooner rather than later,

9   to discuss the very issues that the trustee is discussing,

10  before we continue the litigation path, which is going to be

11  expensive for everybody.  And the trustee doesn't have to take

12  anything my client says at face value; he doesn't have to trust

13  him for the time of day.  But I still think it's always

14  constructive when people talk to each other.  And I'm not

15  disagreeing with Mr. Togut on that; I'm pleased.

16          THE COURT:  So then pick a time and a date at which

17  you will go to Mr. Togut, Mr. Berger's office with all of the

18  books and records.

19          MR. CARLEBACH:  I'm not speaking about production yet.

20  Production of books and records is a --

21          THE COURT:  But don't you see, Mr. --

22          MR. CARLEBACH:  But that's a process, Judge,

23  discovery, Bates stamping that --

24          THE COURT:  It's not discovery and Bates stamping.  We

25  have a situation in which the debtor has not complied with the

1  rules of court and the orders of the Court.  That means the
2  debtor forfeited his entitlement to be trusted.  Therefore --
3          MR. CARLEBACH:  I'm not asking to be trusted; I'm just
4  asking for a conversation.
5          THE COURT:  Yes, you are asking -- you're asking for a
6  conversation --
7          MR. CARLEBACH:  I'm asking for a --
8          THE COURT:  -- without producing any records.
9          MR. TOGUT:  Your Honor, I said it in the pleading that
10  we filed:  this isn't a complex case.
11          THE COURT:  It's not.
12          MR. TOGUT:  I mean, you're carrying on like -- it
13  bears 200 emails here.  It's probably five times how many
14  emails there really are.  If there's twenty-five documents,
15  it's probably twice as many documents.  The production is a
16  piece of cake.  I want to see it before I sit down with the
17  debtor.  This is easy to do; you're making it very complicated,
18  unless there's something that needs to be hidden.
19          MR. CARLEBACH:  What's your problem with having a
20  conversation with the debtor before you get the 200 emails,
21  just to talk?  Where's the harm?
22          MR. TOGUT:  Here's the harm:  I'm the trustee; I'm
23  going to run the case.  You're not running the case.  This is
24  how I want to run the case.
25          MR. CARLEBACH:  That's not -- that means that

1    you're -- that's not an answer.  That's saying that --

2             MR. TOGUT:  Well, what is the answer?

3             MR. CARLEBACH:  -- you rule the roost; understood.

4             MR. TOGUT:  That is the answer, okay.

5             MR. CARLEBACH:  Understood.

6             MR. TOGUT:  If I stood here and said --

7             THE COURT:  Okay, so let's be clear --

8             MR. TOGUT:  -- I don't want to rely on your guy's

9    word --

10            THE COURT:  So let's be clear, Mr. Carlebach; you're

11   not going to produce documents.  That's what --

12            MR. CARLEBACH:  No, that's not what I said, Judge.

13            THE COURT:  I'll tell you what, I'll make it very

14   simply, okay.  I'll set a return hearing date with an order to

15   show cause why the principal of the debtor should not be held

16   in contempt for failure to comply with my order, and we'll come

17   back and we can have this conversation again.  I do not support

18   and I will not contradict the trustee's desire, under all the

19   circumstances, to see documents in addition to having a

20   conversation with your client.  You may find fault with that,

21   you may disagree with it, but that's my view.

22            So I always say to people, we can do things the easy

23   way or we can do things the hard way.  So you seem to be saying

24   that the debtor wants to do things the hard way, so we'll have

25   to do things the hard way; I'm sorry.

1          MR. CARLEBACH:  I can't imagine how you could possibly

2    construe my offer to sit down with the trustee as doing things

3    the hard way.  No one has -- I haven't taken a position on the

4    documents.  I haven't --

5          THE COURT:  How could a debtor in Chapter 11 take the

6    position that it doesn't have to show any documents?

7          MR. CARLEBACH:  Your Honor, we have a motion for a

8    stay.

9          THE COURT:  I denied it.

10          MR. CARLEBACH:  You suggest you -- I understand.  As

11   the motion for a stay under Rule 8007 is a requirement for the

12   motion for the stay before the district court.

13          THE COURT:  Yes, I'm quite aware of that.

14          MR. CARLEBACH:  And I understand that's why Your Honor

15   made a record.  So there are still legal remedies available to

16   us before -- or there are -- before we come to the conclusion

17   that this debtor is in contempt, the debtor still has legal

18   remedies available to it.  And I'm not precluding the trustee's

19   rights, certainly not precluding our rights; I'm simply saying

20   let's talk as we engage in whatever remedies we need to.

21   There's no -- what harm could there be in having a

22   conversation?  The trustee doesn't want to have it; I respect

23   that.

24          MR. TOGUT:  No, no, I'll have it.  So it seems to me

25   we have availability on October 13th at 2 o'clock.  Want to

 1  make an order to show cause returnable?  That would work.

 2          THE COURT:  All right, give me an order to show cause

 3  why the debtor shouldn't be held in contempt for failure to

 4  comply with the prior order and for failure to --

 5          MS. CACUCI:  Prior orders?

 6          THE COURT:  Pardon me?

 7          MS. CACUCI:  Prior orders?

 8          THE COURT:  Prior orders, and --

 9          MS. CACUCI:  Sale order, as well?

10          THE COURT:  Well, I'm going to keep it narrow.

11          MS. CACUCI:  Okay.

12          THE COURT:  Right now, it's the failure to turn over

13  the funds, and we also -- there's been a request to produce

14  documents, which apparently is not going to be complied with.

15          MR. TOGUT:  Okay, it seems to me the Court, sua

16  sponte, could require that showing; we'll file papers, but --

17          THE COURT:  I just need an order -- I'm just entering

18  an order to show cause.

19          MR. TOGUT:  All right.  Okay.

20          MR. CARLEBACH:  Your Honor, with respect to documents,

21  the return date for the production of documents was today.  My

22  client was out of town until this week.  I mean, to the extent

23  that we're going to engage in the production of documents, the

24  way I usually do things is you speak to counsel,

25  notwithstanding subpoenas, and you set up a timetable which

1  works for both parties.  And I don't have a problem entering
2  into a tentative discovery schedule with the trustee.
3        The only thing, I'm pointing this out now is because I
4  understand Your Honor's point about contempt on the funds.
5  With respect to the documents that are due pursuant to an ex
6  parte subpoena, I would ask that the normal discovery
7  requirements under Rule 37 before you enter into contempt on
8  discovery.  There's a lot that's supposed to happen like
9  conferences and good faith between parties before you enter
10  into a contempt on discovery.  So I'm simply asking that the
11  scope of your -- any order to show cause --
12        THE COURT:  Okay, I think --
13        MR. CARLEBACH:  -- for contempt be limited to the
14  funds.  With respect to the documents, I think that there are
15  still --
16        THE COURT:  I think you misunderstood what I was
17  saying.  I want the documents produced by the return date of
18  October 13th.
19        MR. CARLEBACH:  Oh, okay.
20        THE COURT:  That's what I want.
21        MR. CARLEBACH:  And again, I won't --
22        THE COURT:  Okay, and again, what you're describing is
23  what I call the hard way.  We don't need conferences, we don't
24  need meet-and-confers, we don't -- these are -- this isn't
25  General Motors; this is a piece of real estate.  There are

1  going to be a set of emails.  Either there's a general ledger

2  or there is not.

3          To the extent that there were operating reports

4  prepared, documents had to be used to prepare them.  There are

5  bank accounts.

6          MR. CARLEBACH:  The bank account was closed in

7  February, when -- the last bank account that I gave to the U.S.

8  Trustee's office.  The records of these apartments were

9  transferred to the purchaser; they bought these units.  I don't

10  know -- the emails between -- yeah, I mean, that's not an

11  issue, but what's the point of all of it?  What are all these

12  emails going to show; that there's other creditors out there?

13  I mean, I'm simply saying that -- whatever.  Well, like I said,

14  I will speak to my client and I'll speak to the trustee's

15  counsel about how we want to handle the document production

16  side of it, and it is what it is.

17          MR. BERGER:  May I be heard, Judge?

18          THE COURT:  Sure.

19          MR. BERGER:  Neil Berger for the trustee.  If we're

20  going to have a meaningful discussion on the 13th, the

21  documents need to be produced to me in advance of the 13th.

22  The current response deadline under the subpoenas that I issued

23  to Mr. Carlebach and to the debtor is today.  We'll try to work

24  with a production deadline of the 7th.

25          THE COURT:  Okay.

1          MR. BERGER:  But the order that Your Honor entered has

2     an important provision, and we've used it in other cases.  The

3     production must be accompanied by written representation with a

4     sworn declaration that the documents produced have not been

5     altered, that there has been a diligent search for documents;

6     that needs to occur with the production of the documents.

7          Emails are important, drafts of petitions and

8     schedules so we can understand who creditors are, as Your Honor

9     said, general ledgers, monthly operating reports, bank account

10    statements.  If a document doesn't exist, the producing party

11    can simply file a written representation under the penalty of

12    perjury that the document does not exist.  It's not that

13    complicated.

14          The 7th would work for us as a starting point.

15          MR. CARLEBACH:  Well, I've got two days of Rosh

16    Hashanah, which are -- I'm just looking at my calendar -- the

17    3rd and the 4th.  I don't know, we'll -- I'll speak to my

18    client about it; we'll see what we can do.

19          And again, I can only be responsible for my documents

20    and the debtor's documents.  Any subpoenas that the trustee has

21    served on third parties --

22          THE COURT:  Is your client observant, Mr. Carlebach?

23          MR. CARLEBACH:  He is not; he's not Jewish.

24          THE COURT:  Okay.

25          MR. CARLEBACH:  Oh, maybe he is, I don't know.  He

```
 1    does -- he may be half-Jewish, actually.
 2              THE COURT:  Okay.  Well, my -- what I'm speaking to is
 3    to not interfere with religious observance.  The 7th is the
 4    day -- I'm trying to look at the calendar -- the 7th is the
 5    Friday after Rosh Hashanah, so there's really no reason why,
 6    since today is only Thursday the 29th, that a document
 7    collection and review can't begin and continue over the
 8    weekend.  You're unavailable for forty-eight hours, give or
 9    take, until the end of the day on Tuesday; that leaves
10    Wednesday and Thursday.  Again, we're not talking about a room
11    full of documents; we're probably talking about a couple of
12    file folders.  So I think the 7th is achievable, particularly
13    since some time has already gone by.
14              So the order to show cause, which should be returnable
15    on the 13th, will simply state that the debtor shall show cause
16    why he should not be held in contempt and sanctions imposed
17    with respect to the noncompliance with the conversion order,
18    and we'll leave the issue of compliance with the discovery
19    order for another day, and we'll remain optimistic that it will
20    be complied with.
21              MR. TOGUT:  All right, and let me suggest, too, it
22    could be rolling production --
23              THE COURT:  Sure.
24              MR. TOGUT:  -- which would help us because we can be
25    reviewing things.
```

1          THE COURT:  Right.

2          MR. TOGUT:  The emails could be provided immediately.

3          THE COURT:  Right, it --

4          MR. TOGUT:  I mean, that's easy.

5          THE COURT:  Right.  But just to be clear, as I say in

6   all cases, that we live in a world where people have multiple

7   email accounts, so document production nowadays means paper, it

8   means electronically stored information, ESI, in all forms,

9   whether on a work computer, a business account, a personal

10  account, Gmail, Yahoo, AOL, iCloud, whatever it is, and text

11  messages; all electronically stored information.

12         I know it seems onerous, but that's the world that we

13  live in today.  People communicate in very substantive ways on

14  their iPads, on their cell phones, et cetera.  That's what

15  compliance with this order will require.

16         MR. TOGUT:  Okay, thank you.

17         MR. BERGER:  And can we say 4 p.m. on the 7th, Judge?

18         THE COURT:  Yes, 4 p.m. on the 7th.  All right, and in

19  the meantime, Mr. Carlebach, I'm quite sure that Mr. Berger or

20  Mr. Togut will take your phone calls if there's anything you'd

21  like to discuss in the meantime.

22         All right, and Ms. Cacuci, will you continue to try to

23  get to the bottom of --

24         MS. CACUCI:  I'll find out the rate, Your Honor.

25         THE COURT:  -- what it is that you think the City is

1   owed with respect to the transfer taxes --

2           MS. CACUCI:  Yes, absolutely, um-hum.

3           THE COURT:  -- et cetera?

4           All right, I'll look for order to show cause and the

5   order.

6           MR. BERGER:  And the order scheduling the final

7   hearing on the injunction of relief.

8           THE COURT:  Correct.  Correct, okay.  Thank you, all.

9           IN UNISON:  Thank you, Your Honor.

10       (Whereupon these proceedings were concluded at 12:37 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**


RULINGS

|                                          | PAGE | LINE |
|------------------------------------------|------|------|
| Motion for stay pending appeal denied    | 82   | 22   |

1          C E R T I F I C A T I O N

2

3     I, Dena Page, certify that the foregoing transcript is a true

4     and accurate record of the proceedings.

5

6

7

8     _____

9     DENA PAGE

10    AAERT Certified Electronic Transcriber CET**D 629

11

12    eScribers

13    700 West 192nd Street, Suite #607

14    New York, NY 10040

15

16    Date:  October 1, 2016

17

18

19

20

21

22

23

24

25